472 F.2d 693
 4 ERC 1886, 3 Envtl. L. Rep. 20,006
 MONROE COUNTY CONSERVATION COUNCIL, INC., and Ray Huther, on
His Own Behalf and on Behalf of All Others
Similarly Situated, Plaintiffs-Appellants,
v.
John A. VOLPE, Individually and as Secretary of the United
States Department of Transportation, Defendant-Appellee.
 No. 48, Docket 72-1363.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 12, 1972.
Decided Dec. 18, 1972.
 
 Thomas R. Burns, Rochester, N. Y. (Wayne M. Harris, Rochester, N. Y., on brief), for appellants.
 John D. Helm, Dept. of Justice, Washington, D. C. (Kent Frizzell, Asst. Atty. Gen., C. Donald O'Connor, U. S. Atty., John T. Sullivan, Jr., Asst. U. S. Atty., Buffalo, N. Y., and Jacques B. Gelin, Dept. of Justice, Washington, D. C., on brief) for appellee.
 Before FRIENDLY, Chief Judge, and MEDINA and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 The Monroe County Conservation Council and other persons similarly situated seek to enjoin John Volpe, the Secretary of the United States Department of Transportation, from giving federal approval to and funding for a section of the Rochester, New York, "Outer Loop", also known as New York Route 47. The contemplated "Outer Loop" would, on completion, be approximately twenty-three miles long, running from a point near the south shore of Lake Ontario, southerly around Rochester and thence northerly to the Lake shore. Sixteen miles of the loop have been completed, leaving two segments yet to be constructed. The particular project which is the focus of this action is a six lane divided expressway 4.25 miles long, designed to connect the existing loop from the Scottsville Road interchange, completed in 1965, on the west, with the Winton Road, finished in 1968, on the east. The State of New York seeks to construct the highway under the Federal Aid Highway Program, 23 U.S.C. Sec. 101 et seq., with 60% federal financial reimbursement.
 
 
 2
 The appellants' principal objection to the highway project is that it will take eleven acres of parkland by cutting through the Genesee Valley Park, owned by the City of Rochester, for some 3200 feet, to follow the Erie Barge Canal corridor through the park and across both the Genesee River and Red Creek. Approximately two-thirds of the sector through the park would be built on a viaduct.
 
 
 3
 The park, containing 800 acres of land, is fully served by bus from the inner-city and provides all the usual recreational facilities, including one of the nation's oldest public golf courses. In addition, an average of two hundred persons a day engage in boating on the Genesee River and Erie Canal in the park area.
 
 
 4
 If the highway is constructed, the appellants assert, among other things, that it will do substantial damage to trees and other natural flora and fauna, destroy walking paths adjacent to the Erie Canal, interrupt easy access to the park, produce noise and pollution, and create a general nuisance inhibiting the aesthetic pleasures of the area.
 
 
 5
 Although state and federal highway officials have been involved in various formal and informal contacts concerning this project from at least 1957, the State has not yet submitted a program for federal aid funding and the federal government is not yet committed to the project, see, 23 U.S.C. Sec. 106(a). The federal government has, however, reviewed and approved the transcript of the public hearing held by the State on January 24, 1966, approved on February 8, 1967, preliminary location plans, and sanctioned on May 7, 1971 the taking of Genesee Valley Park land. Furthermore, it is undisputed that it stands ready to give final approval to the project when completed plans, specifications, and estimates are submitted.
 
 
 6
 This action, claiming violation of several federal laws and regulations, was instituted on July 20, 1971, and cross-motions for summary judgment were filed. Affidavits were submitted by both parties and the court took testimony from Robert E. Kirby, the New York Division Engineer for the Federal Highway Administration, before entering judgment for the defendant-appellee, the Secretary of Transportation.
 
 
 7
 The issues concern the construction and application of four areas of federal statutory law and whether or not the mandates of the statutes were complied with. These are: the National Environmental Policy Act; the statutes regarding the taking of parkland; the statute calling for hearings on highways constructed with federal financial aid; and the requirement that a permit be obtained to construct a bridge over a navigable river. We hold that the requirements of the statutes and regulations were not adequately complied with. We, therefore, reverse and remand.
 
 I. The National Environmental Policy Act
 
 8
 The first point raised by the appellants is that the Secretary cannot approve federal funding of the project until he has filed an environmental impact statement as required by the National Environmental Policy Act of 1969, 42 U.S.C. Sec. 4321, et seq.[1]
 
 
 9
 *****
 
 
 10
 * * *Although the district court found that a statement approved by Secretary Volpe on May 7, 1971, satisfied the requirements of a NEPA impact statement, the Secretary relies in this court almost exclusively on the argument that no impact statement is required.
 
 
 11
 Before dealing with this latter contention, however, it is necessary to consider whether or not the Secretary's two and one-half page statement entitled "Environmental Statement and Determination," does satisfy NEPA and the obligations placed upon him by 49 U.S.C. Sec. 1653(f) and 23 U.S.C. Sec. 138.[2] We are satisfied that it falls far short of the NEPA requirements, as well as the Council on Environmental Quality Guidelines, 36 Fed.Reg. 7724-7729 (1971), and the Department of Transportation Order 5610.1 (October 7, 1970), designed to implement NEPA.
 
 
 12
 The primary purpose of the impact statement is to compel federal agencies to give serious weight to environmental factors in making discretionary choices, see, Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 783, 787 (D.C.Cir.1971); National Helium Corp. v. Morton, 455 F.2d 650, 656 (10 Cir. 1971); Calvert Cliffs' Coord. Comm., Inc. v. Atomic Energy Comm., 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971). It is, at the very least, "an environmental full disclosure law," Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 749, 759 (E.D.Ark.1971), for agency decision makers and the general public. In light of this, the Secretary of Transportation was bound fully to comply with the requirements of the statute, and mere token efforts in that direction do not suffice.
 
 
 13
 Other than saying that a road will go through a park, the Secretary's statement does not cover four of the five items required by the statute, 42 U.S.C. Sec. 4332(2)(C) even though he is required to discuss them in detail. These are: (i) the environmental impact, such as the amount of land that will be taken and the volume of traffic which will be using the highway; (ii) adverse environmental effects which cannot be avoided, such as the noise and pollutants which will be generated; (iv) the relationship between local short-term use of the land and the maintenance and enhancement of long-term productivity; and (v) irreversible and irretrievable commitments of resources which would be involved if the highway were built, such as the number of trees that would be destroyed. The statement makes passing mention of possible alternatives to the proposed action (iii), but it does so in such a conclusory and uninformative manner that it affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives. The requirement for a thorough study and a detailed description of alternatives, which was given further Congressional emphasis in Sec. 4332(2)(D), is the linchpin of the entire impact statement.[3] Without the detailed statement the conclusions and decision of the agency appear to be detached from and unrelated to environmental concerns, see, Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833-837 (1972); see also, Greene County Planning Bd. v. Federal Power Comm., 455 F.2d 412, 419 (2 Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). Consideration, of course, must also be given to the feasibility and impact of the abandonment of the project. Calvert Cliffs', supra, 449 F.2d at 1114; Seaborg, supra, 463 F.2d at 787.
 
 
 14
 Another requirement of Sec. 4332(2)(C) is that comments on the proposed action must be sought from other federal agencies with expertise in the field. While the record reveals that the Transportation Department did receive letters from the Department of the Interior and the Department of Housing and Urban Development concerning the taking of the parkland, there is no indication that they accompanied the statement through the review process as required by this section and in compliance with Department of Transportation Order 5610.1(7)(e), (g). Obviously there is no purpose in obtaining outside views if they are not placed before the decision maker, especially those which may be opposed to the project, see Greene, supra, 455 F.2d at 418.
 
 
 15
 Finally, there is no indication that the Department of Transportation sought the opinion of the Council on Environmental Quality, as required by Sec. 4332(2)(C) and the Council's Guidelines, 10(b), 36 Fed.Reg., at 7726.
 
 
 16
 The Secretary's statement is plainly insufficient to satisfy the NEPA requirements. It is, therefore, necessary to consider the Secretary's claim on appeal that no statement is required for this project.
 
 
 17
 An impact statement must be prepared for "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. Sec. 4332(2)(C). Although in some circumstances the terms "major" and "significantly affecting . . . the . . . environment" have to be considered separately, Hanly v. Mitchell, 460 F.2d 640, 644 (2 Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) the Department of Transportation has determined that any action significantly affecting the environment is major, DOT Order 5610.1, Definitional Guidelines (2), and that any approval of a project taking parkland is one significantly affecting the environment, id., at (4)(a)(2). Even apart from the Transportation Department's Order, however, there is no difficulty in concluding that this is the type of action which requires an impact statement. As the cost of the viaduct section alone would be over $14,000,000, of which the federal government is asked to contribute 60%, there is no question that this is major action, cf., Upper Pecos Ass'n v. Stans, 452 F.2d 1233, 1235 (10 Cir. 1971), cert. granted, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 330 (1972); Named Ind. Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1024-1025 (5 Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972), and it cannot be disputed that a taking of eleven acres of parkland in a thickly settled city significantly affects the human environment.
 
 
 18
 The crux of the Secretary's argument, however, is that NEPA does not apply to a project which was as far advanced as this one on the effective date of the Act, January 1, 1970. But it is only this specific 4.25 mile segment of highway which is of concern. It is true that other portions of the contemplated "Outer Loop" have been completed, but that fact does not in any way obligate the federal government to fund the section in question here.
 
 
 19
 Congress directed that NEPA, which provided for an impact statement, was to be implemented to "the fullest extent possible," 42 U.S.C. Sec. 4332. In using this language, it was not creating a loophole to avoid compliance, but rather was stating that NEPA must be followed unless some existing law applicable to the agency made compliance impossible, Conf.Rep.No.91-765, 91st Cong., 1st Sess., U.S.Code Cong. & Ad.News, pp. 2767, 2770 (1969). See also, Ely v. Velde, 451 F.2d 1130, 1138 (4 Cir. 1971). Calvert Cliffs', supra, 449 F.2d at 1114-1115. This court has been rigorous in applying NEPA to Federal Power Commission decisions, even where hearings were held prior to the effective date, Scenic Hudson Preservation Conf. v. Federal Power Comm., 453 F.2d 463, 481 (2 Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972), and a project was under construction but not licensed prior to the effective date, Greene, supra, 455 F.2d at 424.
 
 
 20
 With regard to highway aid, the federal government is not obligated to fund a particular project until the Secretary of Transportation has approved plans, specifications, and estimates for the construction, 23 U.S.C. Sec. 106(a) (PS&E Approval). This approval in the present case was not given prior to the effective date of NEPA, and, therefore, an impact statement must be prepared, San Antonio Conservation Society, supra, 446 F.2d at 1025; Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1330-1332 (4 Cir. 1972). See also, Lathan v. Volpe, 455 F.2d 1111, 1120 (9 Cir. 1971).[4]
 
 II. Taking of Parkland
 
 21
 The appellants also contend that the Secretary acted in excess of his authority in approving the use of land from the Genesee Valley Park for this highway project. Two identical statutes say that "the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park . . . unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park . . . resulting from such use", 23 U.S.C. Sec. 138; 49 U.S.C. Sec. 1653(f).
 
 
 22
 Relying on the Secretary's statement of May 7, 1971 (which was also designed to fulfill the NEPA requirements), the court below found that the defendant acted within the scope of his authority and not arbitrarily or capriciously.[5]
 
 
 23
 These statutes, which are particularly intended to protect parkland, represent a determination by Congress that "everything possible should be done to insure [parklands] being kept free of damage or destruction by reason of highway construction", S.Rep.No.1340, 90th Cong., 2d Sess., U.S.Code Cong. & Ad.News, pp. 3482, 3500 (1968); see also, San Antonio Conservation Society, supra, 446 F.2d at 1024. It is often an irresistible temptation to take parkland for highways, because it already belongs to the public and is usually more convenient for road construction, but these laws are "a plain and explicit bar to the use of federal funds for construction of highways through parks [with] only the most unusual situations . . . exempted", Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971).
 
 
 24
 The exception to the prohibition is when there is "no feasible or prudent alternative" to the taking. A feasible alternative route is one that is compatible with sound engineering, Overton Park, supra, at 411, 91 S.Ct. 814; D. C. Federation of Civic Associations v. Volpe, 148 U.S.App.D.C. 207, 459 F.2d 1231, 1237 (1971), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), and a prudent alternative route is one that does not present unique problems, that is, an alternative without truly unusual factors so that the cost or community disruption would reach extraordinary magnitudes, Overton Park, supra, 401 U.S. at 412-413, 91 S.Ct. 814. In other words, a road must not take parkland, unless a prudent person, concerned with the quality of the human environment,[6] is convinced that there is no way to avoid doing so.
 
 
 25
 Therefore the district court must make "a thorough, probing, indepth review" to be assured that the Secretary, in approving the taking of parkland, has acted properly, Overton Park, supra, at 415, 91 S.Ct. 814. It is abundantly clear that such a review was not undertaken in this case, and under the circumstances, summary judgment was an unusually inappropriate vehicle for determination of the issues. The plaintiffs below in support of their motion filed the affidavit of an engineer outlining three possible alternatives to the taking of parkland, and the Secretary's witness, Highway Engineer Kir by, testified that the only routes given formal consideration were ones which went through the park.
 
 
 26
 Even if there is no feasible and prudent alternative to the taking of parkland, the Secretary still may not give his approval until there has been "all possible planning to minimize harm to such park." This requirement also has not been met in this case.
 
 
 27
 There is evidence in the record indicating that in the last several years New York officials have been making some efforts to limit the adverse impact of the highway on the park; however, the Secretary has nowhere made the actual implementation of these suggestions a condition of his approval, cf., San Antonio Conservation Society, supra, 446 F.2d at 1016-1017. Rather, several times he has refused to impose conditions because he claims that he is confident that the state officials will do all they can to minimize the damage to the park; and, in his statement approving the use of the park, the Secretary refers to studies underway that will determine what type of highway structure will enhance rather than detract from the park. He concluded that "all possible planning to minimize harm has been and will continue to be exercised by the responsible officials." (Emphasis added.) The statutory mandate is not fulfilled by vague generalities or pious and self-serving resolutions or by assuming that someone else will take care of it. The affirmative duty to minimize the damage to parkland is a condition precedent to approval for such a taking for highway purposes where federal funds are involved; and the Secretary must withhold his approval unless and until he is satisfied that there has been, in the words of the statute, "all possible planning to minimize harm to such park . . .," and that full implementation of such planning to minimize is an obligated condition of the project, see, D. C. Federation, supra, 459 F.2d at 1239.
 
 III. Hearings
 
 28
 Citing both a statute, 23 U.S.C. Sec. 128, and Department of Transportation regulations pursuant to it, Policy and Procedure Memorandum (PPM) 20-8, 23 C.F.R.App. A (1972), the appellants claim that a second public hearing on this highway project must be held before the Secretary can approve federal aid. An initial hearing was held by New York state highway officials on January 24, 1966.[7]
 
 
 29
 At the time of the public hearing, federal law required state highway departments to hold public hearings to consider the economic effects of proposed highway locations;[8] however, the statute was amended, effective August 23, 1968, to require the hearings to consider not only the economic effect of a location, but also the social and environmental effects of such a plan, and in 1970 the statute was further amended to require the state to file a report with the Secretary indicating the consideration given by it to the economic, social, environmental and other effects of a planned highway.[9]
 
 
 30
 The primary question, here, is whether or not the State Highway Department must, for this project, hold the expanded hearings required by the 1970 amendment. The district court made no ruling on this point and the appellee Secretary did not argue it.
 
 
 31
 The Fourth Circuit, the only one to have previously considered this problem, has held that the expanded hearings must be held if the project is not at a critical state, i. e., one at which the costs of a new location would certainly outweigh the possible benefits of a change, Arlington Coalition, supra, 458 F.2d at 1337; Fayetteville Area Chamber of Commerce v. Volpe, 463 F.2d 402, 406 (4 Cir. 1972.) We adopt a more definite standard, which is not necessarily in conflict with that of the Fourth Circuit, and that is that the expanded hearings are required whenever PS&E approval has not been given prior to the effective date of the amendment. This rule is based upon the fact that a hearing is a condition precedent to the granting of federal aid, and, therefore, the Secretary must apply the statute which is in effect when he awards that aid. This concept is consistent with the federal policy which favors the advancement of environmental concerns, 42 U.S.C. Sec. 4332(1), and gives recognition to the importance of the hearings to proper decision making, see, D. C. Federation of Civic Associations v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436, 441-442 (1970).
 
 
 32
 In light of the fact that New York has not yet submitted plans for PS&E approval, it is required to hold the hearings and make the formal report mandated by the present Sec. 128. It is beyond question that the 1966 hearing was insufficient to comply with the current requirements. For one thing, the viaduct structure was not part of the plans presented at that hearing, and it was therefore impossible for the hearing to focus on the environmental impact of such a major design feature.
 
 
 33
 In order to implement the 1968 amendment to 23 U.S.C. Sec. 128, the Department of Transportation issued its Policy & Procedure Memorandum (PPM) 20-8 on January 14, 1969, which, in all cases, provides for both a "corridor public hearing" and a "highway design public hearing." The corridor hearing is preliminary and is concerned with "the need for, and the location of, a Federal-aid highway." The "highway design public hearing" is a hearing that:
 
 
 34
 "(1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal;
 
 
 35
 (2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and
 
 
 36
 (3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs." PPM 20-8, (4)(b).
 
 
 37
 At this hearing the state presents the major design features of a proposed highway for public comment and discussion and the ideas, suggestions, criticisms and facts garnered from the hearing are considered by the state highway department along with its own data and studies in producing the design which it submits to the Secretary for approval.
 
 
 38
 We think it is clear that the requirements of the highway design hearing, as outlined in PPM 20-8, will be met by any hearing sufficient to satisfy the requirements of 23 U.S.C. Sec. 128(a), since the statute requires that the state consider "the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing . . . ." Therefore, it is unnecessary for us to decide whether or not the PPM, by its own terms, see, e. g., PPM 20-8 Sec. 6(d), requires the design public hearing for this project which was under way when the PPM was issued.
 
 
 39
 While it is true that the state has held one location hearing with respect to this project, no consideration of the environment was required by the statute at that time. Moreover, as we have noted, see fn. 7, it appears that discussion at the hearing was improperly restricted. Such a hearing will in any event be most valuable in aiding the agency in its preparation of the impact statement which we have today held is required by NEPA.
 
 IV. Bridge Permit
 
 40
 It is unlawful to construct a bridge over any navigable river without a permit, 33 U.S.C. Sec. 401.[10] The Conservation Council claims that the Secretary may not approve this project until such a permit has been obtained for the planned construction over the Genesee River, but the district court found that no permit was required because the river was not navigable. On appeal, the Secretary admits that the portion of the river in question is navigable as previously found by this court in Rochester Gas & Electric Corp. v. Federal Power Comm., 344 F.2d 594 (2 Cir.), cert. denied, 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965), but he argues instead that his approval of the project is not dependent upon the acquisition of a permit by the State of New York.
 
 
 41
 This position is wholly untenable. When the Secretary gives his approval to a project, there is "a contractual obligation of the Federal Government for the payment of its proportional contribution thereto", 23 U.S.C. Sec. 106(a). It defies reason to think that the federal government should obligate itself to a project which has not yet complied with federal law, and Department of Transportation regulations specifically state that no federal funds are to be paid for any cost incurred not in conformity with federal law, 23 C.F.R. 1.9 (1972). It is also interesting to note that Highway Division Engineer Kirby testified that it is normal operating procedure to make certain that a state has all necessary permits before it is allowed to begin construction. Therefore, no approval for federal funding of this project can be given until the State has secured the necessary permit to build a bridge over the Genesee River.
 
 
 42
 The decision of the district court is reversed, and the case is remanded with the direction that the Secretary of Transportation be enjoined from approving the funding of the 4.25 mile segment of the Rochester "Outer Loop," until the court, after proper hearing is satisfied:
 
 
 43
 (1) that the requirements of NEPA have been met, including the preparation and good faith consideration of an impact statement;
 
 
 44
 (2) that there is no feasible and prudent alternative to the taking of parkland and that all possible planning has been done to minimize harm to the park;
 
 
 45
 (3) that the State has held the hearing required by 23 U.S.C. Sec. 128(a) and filed a copy of the transcript and the necessary report on its consideration of the hearing with the Secretary; and
 
 
 46
 (4) that the State has acquired the permit necessary to build a bridge over the Genesee River.
 
 
 47
 All of these directions shall be construed and applied in conformity with the opinion of this court.
 
 MEDINA, Circuit Judge (concurring):
 
 48
 I concur, but with some reluctance. I am reluctant because I think one unfortunate result of our decision in this case will be a further delay of four or five years that could easily have been avoided. And this delay will cause great hardship to the people of Rochester who have already waited too long for the completion of this Outer Loop around the city. What bothers me is that a study of this record makes it fairly certain that after all the i's have been dotted and all the t's crossed, the final construction will be substantially the same as the one now proposed and rejected by us.
 
 
 49
 On the other hand, I am persuaded that some state and federal highway officials are inclined to look down on conservationists and environmentalists as trouble makers. The only way to change this attitude is to require full and strict compliance with applicable valid statutes and administrative regulations. That there has been no such compliance here is clearly established in my brother Anderson's well reasoned and persuasive opinion.
 
 
 
 [1]
 The pertinent part of NEPA for this claim is 42 U.S.C. Sec. 4332(2)(C), (D):
 "The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall-
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
 (D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;".
 
 
 [2]
 For a discussion of these statutes, see the next section, infra
 
 
 [3]
 The Council on Environmental Quality Guidelines, 6(iv), 36 Fed.Reg. 7724, 7725 (1971), states that:
 "A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential."
 
 
 [4]
 The only Courts of Appeals decisions holding that NEPA did not apply to federal highway aid were in cases in which "PS&E approval" had been given by the Secretary prior to January 1, 1970, Ragland v. Mueller, 460 F.2d 1196 (5 Cir. 1972); Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613, 624 (3 Cir. 1971)
 It should also be noted that 23 U.S.C. Sec. 109(h) requires that not later than 90 days after July 1, 1972, the Secretary promulgate guidelines to be applied to all projects that had not yet received "PS&E approval" prior thereto, to insure that certain specified environmental factors are considered in Federal-aid highway approvals.
 
 
 [5]
 In addition to the Secretary's statement, the court had before it the affidavit and testimony of Highway Division Engineer Kirby. Included as part of the affidavit was a bundle of papers entitled, "Volpe's Office File on Section 4(f) [49 U.S.C. Sec. 1653(f)]," which allegedly was the administrative record upon which he acted
 Although formal findings are not required by the statutes, DOT Order 5610.1 (8)(c) does require them as of October 7, 1970, cf., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 417-418, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Although not urged as a point on appeal, the Secretary's May 7, 1971 statement does not comply with the DOT order in a number of respects and, if the Department further considers the funding of this project, it should follow its own directive.
 
 
 [6]
 Congress has mandated that all federal laws shall be interpreted in accordance with the policies set forth in the National Environmental Policy Act of 1969, 42 U.S.C. Sec. 4332(1)
 
 
 [7]
 The Conservation Council also attacks the validity of this hearing on the ground that it was held at 2:00 p. m. on a business day during a heavy snowstorm, and was, therefore, inconvenient to the public. There is no merit to this claim
 The hearing itself was improperly conducted. The purpose of the hearings is to permit the people who will be affected by highway construction to voice their suggestions and complaints, cf., S.Rep.No. 1340, 90th Cong., 2d Sess., U.S.Code Cong. & Ad.News, pp. 3482, 3492 (1968); yet the moderator began the hearing by stating that "the objective of the hearing is to provide an assured method whereby the State can furnish to the public information concerning the State's highway construction proposals. We are not here to engage in a free-for-all debate." The highway officials, in addition to presenting and describing the project are there to hear what the unorganized public has to say about it.
 
 
 [8]
 23 U.S.C. Sec. 128(a) (1966)
 
 
 [9]
 23 U.S.C. Sec. 128 (1970)
 
 
 [10]
 The Secretary of Transportation, who is given the authority to issue permits by 49 U.S.C. Sec. 1655(g)(6)(A), has delegated this authority to the Commandant of the Coast Guard, 49 C.F.R. Sec. 1.46(c)(8) (1972), who is the official by whom the decision must be made, see, Accardi v. Shaughnessy, 347 U.S. 260, 265-267, 74 S.Ct. 499, 98 L.Ed. 681 (1954)