**ENVIRONMENTAL DEFENSE FUND, INC., Plaintiff,**

v.

**Barbara BLUM et al., Defendants,**

**American Farm Bureau Federation, and State of Mississippi, et al., Intervening Defendants.**

**Civ. A. No. 78–0577.**

United States District Court, District of Columbia.

Sept. 27, 1978.

William A. Butler, Ronald J. Wilson, Environmental Defense Fund, Washington, D. C., for plaintiff.

Fred Disheroon, Atty., Dept. of Justice, Alan H. Carpien, Environmental Protection Agency, Washington, D. C., for defendants.

Allen A. Lauterbach, Gen. Counsel, C. David Mayfield, Jerome J. Werderitch, Park Ridge, Ill., Zachary D. Fasman, Thomas P. Gies, Washington, D. C., for intervenor-defendant American Farm Bureau Federation.

A. F. Summer, Atty. Gen., P. L. Douglas, Peter M. Stockett, Jr., Jackson, Miss., Donald J. Mulvihill, R. Bruce Dickson, Washington, D. C., for intervenor-defendants State of Mississippi and Ross.

## MEMORANDUM OPINION

GESELL, District Judge.

This is an action to set aside a ruling of the Environmental Protection Agency ("EPA") which grants in part an application of the State of Mississippi under Section 18 of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), as amended, 7 U.S.C. § 136 *et seq.* (1976), requesting permission to distribute and apply for one year a chemical known as Ferriamicide for the control of the imported fire ant. The matter comes before the Court on cross-motions for summary judgment. Numerous issues are presented which have been hotly contested by the parties and intervenors in unnecessarily protracted proceedings. The Court heard extensive argument after receiving elaborate briefs and other documentation.

### Mississippi's Application

The imported fire ant has plagued Mississippi and eight other southern states for many years.[1] The harm visited by this pest, characterized by the National Academy of Sciences as an agricultural "nuisance," is twofold: its bite is painful and causes a severe allergic reaction in a small percentage of the population and, in rare instances, death; in addition, mounds built by the ants interfere with certain agricultural operations such as mowing and harvesting.

Faced with this problem, federal and state authorities embarked on a combined fire ant control program in 1957. In 1962, these authorities began treating the infested areas—then apparently 30 million acres—with a pesticide known as Mirex. In late 1976, however, the EPA issued an order barring any use of Mirex after June 30,

---

1. Apparently two varieties of the imported fire ant have been introduced into this country from South America, one in the 1910's and the other in the 1930's. Until the 1950's, the fire ant was limited to a few counties in Alabama. During that decade, however, the ant population exploded to such an extent that it now exists in Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas.

1978;[2] a three-year study had found the chemical to be a likely carcinogen. Faced with this cancellation of Mirex, the Mississippi Department of Agriculture and Commerce, with the aid of EPA and the United States Department of Agriculture, undertook to develop an alternative means of "controlling" fire ants, which during the reign of Mirex had spread to an area of 190 million acres. The product of its efforts was Ferriamicide, a compound of ferrous chloride, an amine, and the suspect carcinogen Mirex.

The distribution and use of pesticides such as Ferriamicide is subject to pervasive control and regulation under FIFRA which prescribes a system of registration involving extensive testing to determine efficacy, health hazards, and related issues. *Id.* § 136a; 40 C.F.R. §§ 162.5–162.8 (1977). The Act, though, contains a significant, if limited, exception to its normal registration requirements. Section 18 allows the Administrator, "at his discretion," to exempt any federal or state agency from the registration requirement "if he determines that emergency conditions exist which require such exemption." *Id.* § 136p.

When Mississippi developed Ferriamicide, insufficient data, of course, existed to permit its registration. For this reason EPA, on September 29, 1977, issued to the Mississippi Authority for Control of Fire Ants a one-year permit for the experimental use of Ferriamicide on 5,500 acres of nonagricultural, nonpopulated land in Mississippi and Florida. 42 Fed.Reg. 54331 (1977). *See* 7 U.S.C. § 136c (1976).

Three months later Mississippi submitted a further application, this time for a section 18 exemption to permit it to manufacture and use Ferriamicide on 17 million acres of agricultural and recreational land once further use of Mirex was terminated on June 30, 1978.

### The Proceedings to Date

EPA processed the Mississippi application in a very confusing and clumsy manner, thus creating much of the difficulty and uncertainty which permeates this case. Initially it noticed the application and requested public comment within 25 days. 42 Fed. Reg. 64734 (December 28, 1977). The record as a result was formally closed on January 23, 1978. During the comment period EPA was inundated with letters, telephone calls and telegrams from private citizens, environmental groups, state authorities, members of Congress, and others, most of them supporting the requested exemption. Considerable technical data was assembled and there were various meetings held with interested groups. No effort was apparently made at any time, however, to place the comment data in an identifiable file open for public inspection.

When the record was closed, comments from interested parties continued to be received and technical studies proceeded apace. In short, active consideration of all aspects of the application continued. Plaintiff proceeded with the understanding that the record had been closed. When additional data came to its attention it moved on two occasions formally to reopen the record. On the whole, however, although its interest in the matter continued, it was unaware of much of the material coming to EPA's attention.

On March 8, 1978, Deputy Administrator Blum, to whom authority to grant or deny the exemption request had been delegated, adopted an 18-page memorandum written by the Assistant Administrator for Toxic Substances recommending that the exemption be granted. The Environmental Defense Fund ("EDF"), interpreting this as a final determination, immediately filed suit to enjoin effectuation of the opinion. Named as defendants were EPA, its Administrator, Deputy Administrator, and Assistant Administrator for Toxic Substances. Promptly after the complaint was filed, the parties jointly sought expeditious treatment by this Court and undertook to stipulate the

---

**2.** This was accomplished by agreement with the sole distributor of Mirex, the State of Mississippi.

record upon which review would be held. Cross-motions for summary judgment were filed and briefed, and argument was held.

As the argument progressed it appeared to the Court that the memorandum purporting to grant the exemption was not a final order since (1) by the agency's own admission the precise conditions to be imposed upon emergency use of Ferriamicide had not yet been formalized, and (2) the order had not yet been published in the *Federal Register,* as required by the agency's own regulations, 40 C.F.R. § 166.10 (1977).

Accordingly, the Court refused to act but agreed to hold proceedings in abeyance until a final order was issued. It was agreed that EPA would not authorize the manufacture, distribution, or use of Ferriamicide until after it issued a final order and that order had been reviewed by the Court.

On July 28, 1978, a final order was promulgated and this was published in the *Federal Register.* It was supported by lengthy findings and signed by Deputy Administrator Blum. Promptly a new round of briefs were submitted and the matter came on again for oral argument. At this point, to the consternation of the Court, it became apparent that the parties had not agreed on the contents of the record which had been before the agency and which would form the backdrop for judicial review of the final order. The Court therefore required EPA to designate those documents which it had relied on and those additional documents noted by plaintiff which had existed in EPA's file as of July 28, 1978, and which plaintiff considered significant. Thereafter the Court received additional briefs and the cross-motions came on again for oral argument.

### The Order

Mississippi was required by the Deputy Administrator's final order to monitor all Ferriamicide distribution and to ensure compliance with the following conditions.

(1) Aerial broadcast of the substance was banned.

(2) Ground broadcast was permitted on parks, cemeteries, schoolyards, camp grounds, and fairgrounds, but only by certified applicators.

(3) Mound-to-mound application was permitted on all other lands. Non-certified applicators, often farmers, would be allowed to obtain bags of the substance only if they certify that they have more than 50 mounds or more than one acre to treat. Non-certified applicators must also read and sign a form containing several warnings before being allowed to purchase and use Ferriamicide. Women of childbearing age were prohibited from applying the substance under all circumstances.

(4) Certain labelling conditions were specified.

This final order took into account additional health risk data which had come to light since the agency's earlier March 8 action, responded favorably in most respects to a significant "addendum" Mississippi had submitted to its initial exemption application after the Court's first hearing, and finalized all the conditions under which Ferriamicide would be distributed.

### Reviewability

Notwithstanding the existence of the agency's final order, defendants challenge the Court's power to review the exemption decision, citing its discretionary and emergency nature. Defendants rely on section 16 of FIFRA which grants review jurisdiction in the district courts only of "final Agency actions not committed to Agency discretion by law . . . ." *Id.* § 136n(a) (1976). Section 18 of the Act allows the Administrator, "*at his discretion,* [to] exempt any Federal or State agency from [registration] if he determines that emergency conditions exist which require such exemption." *Id.* § 136p (1976) (emphasis added). Since most administrative decisions are discretionary, sections 16 and 18 read in conjunction do not conclude the inquiry. Language in the Administrative Procedure Act almost identical to section 16 has been read by the Supreme Court to bar review only "in those rare instances where

'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). There is law to be applied in this instance. As shown below, the statute, its legislative history, and the agency's own regulations establish standards against which the Deputy Administrator's decision must be judged.

In support of their argument that the emergency nature of the decisions bars the time-consuming process of judicial review, defendants cite *Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). *Morris* held a decision by the Attorney General not to interpose an objection to a state's proposed voting law change unreviewable. Under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1976), the Attorney General has only 60 days within which to object to a proposed change. The Court recognized Congress's concern about undue delay in the implementation of valid state legislation and found that "[s]ince judicial review of the Attorney General's actions would unavoidably extend this [60-day] period," it was "necessarily precluded." 432 U.S. at 504–05, 97 S.Ct. at 2421.

*Morris,* however, does not counsel a similar result in this case. The Court there reaffirmed the fundamental proposition stated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." 432 U.S. at 501, 97 S.Ct. at 2418. The legislative history of FIFRA does not support such a showing; rather, the contrary intent may be discerned from committee reports. *See generally* S.Rep. No.92–838, 92d Cong., 2d Sess. pt. I at 12 (1972); *id.* pt. II at 39; 1972 U.S.Code Cong. & Admin.News 3993 *et seq.* Furthermore, the *Morris* Court expressly noted that it was not faced with the situation where the review sought would, as here, be the "exclusive" means of challenging the action in controversy. *Id.* at 505–07, 97 S.Ct. 2411. In *Morris,* inability to challenge the Attorney General's decision did not remove all means of contesting the validity of the law; indeed a lawsuit directly challenging its constitutionality had already been brought. In this case, a finding of review preclusion would eliminate all means of challenging the Deputy Administrator's decision. *See Save the Bay, Inc. v. Administrator of EPA,* 556 F.2d 1282, 1296–97 n. 15 (5th Cir. 1977).

The facts of this case, moreover, belie the very premise of defendants' argument. For those instances where time really is "of the essence," EPA regulations call for "crisis exemptions." 40 C.F.R. §§ 166.2(c), 166.8 (1977). Not only was this expedited procedure not invoked in this case, but the agency permitted a lapse of seven months between notice of the application and issuance of the final order. The long-standing and strong presumption against the implied preclusion of judicial review will not be undermined in these circumstances.

## Standard of Review

■ Defendants seek to limit review by contending that a section 18 exemption decision does not fit within the rubric of informal rulemaking governed by section 4 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1976). Defendants would thereby absolve the EPA of the APA's various notice and comment requirements. The Court rejects this position with respect to the case at hand. Exemption from the requirements of section 4 of the APA should be allowed only where strong congressional intent to that effect exists or when the matter fits within 5 U.S.C. § 553(a) (1976), or *id.* § 553(b)(A) & (B). Neither of the cited subsections govern this case. Under other circumstances, section 553(b)(B) might be deemed applicable; but, since the agency here did permit a comment period, it cannot now be heard to claim that any such comment period was "impracticable, unnecessary, or contrary to the public interest."

The Court is well aware that section 18 of FIFRA is an "emergency" provision and, as such, should not be unnecessarily burdened

by procedural restrictions. It may well be that some section 18 crisis determinations by the EPA need not meet all the requirements of section 4 of the APA. This is not, however, a "crisis" case. When Mississippi submitted its application for the exemption in December 1977, any likely "emergency" was six months away. Thus, APA section 4's requirements imposed no intolerable burden. Moreover, the application sought "an agency statement of general or particular applicability and future effect . . ." 5 U.S.C. § 551(4) (1976) (definition of a "rule").

Judicial review of an informal rulemaking proceeding such as this is governed by 5 U.S.C. § 706(2)(A)–(D) (1976). The Court must first decide whether the agency has observed the "procedure required by law." 5 U.S.C. § 706(2)(D); *see Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 417, 91 S.Ct. 814. Second, the Court must determine the scope of the agency's authority and whether, on the facts presented, the agency's decision lies within that range. 5 U.S.C. § 706(2)(C); *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415–16, 91 S.Ct. 814. Finally, if proper procedures have been followed and the matter lies within the agency's delegated powers, section 706(2)(A) requires a finding that the choice made by the agency was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In order to make this latter finding, the Court must consider whether the decision was based on a consideration of all relevant factors and has a rational basis. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814; *Ethyl Corp. v. EPA,* 176 U.S. App.D.C. 373, 406, 541 F.2d 1, 34, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

The Court's review in this respect is highly deferential and presumes the agency's action to be valid. *Id.* Particularly is this true in cases where the agency's decision rests predominantly on technical and scientific data in an area where much discretion has been delegated to it by Con-

gress. *Weyerhaeuser Co. v. Costle,* No. 76–1674, slip. op. at 21–22 (D.C. Cir. Sept. 5, 1978). There, the Court of Appeals defined its review responsibility as follows:

> In sum, unless we are quite certain of our basis for doing so, we must be slow to overturn the Agency's judgment . . . when Congress has required it to act quickly and decisively despite the lack of exact data.

*Id.,* at 22. These principles apply with force to the case at hand.

### Existence of an "Emergency"

Plaintiff, of course, accepts the Court's conclusion as to reviewability but strenuously contends that no "emergency conditions" exist to justify Mississippi's application.

Prior to award of a section 18 exemption under FIFRA, EPA must make two findings. It must first find that "emergency conditions" exist. 7 U.S.C. § 136p (1976). Second, it must determine, as stated by the House Report on the House bill, "that the proposed emergency use will not endanger man or adversely affect the environment." H.R.Rep.No.92–511, 92d Cong., 1st Sess. 27 (1971). The Senate bill, which (unlike the House bill and the final Act) did not circumscribe the agency's discretion to "emergency" situations, was similarly interpreted: "exemptions would be granted only if unreasonable adverse effects on the environment would not result." S.Rep.No.92–970, 92d Cong., 2d Sess. 42 (1972). FIFRA defines "unreasonable adverse effects on the environment" to be:

> any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide.

7 U.S.C. § 136(bb) (1976).

In December 1973, the EPA promulgated regulations to govern the exercise of its discretion under section 18. *See* 40 C.F.R. Part 166 (1977). Those regulations provide various standards to guide the EPA in determining the existence of an "emergency":

An emergency will be deemed to exist when: (a) A pest outbreak has or is about to occur and no pesticide registered for the particular use, or alternative method of control, is available to eradicate or control the pest, (b) significant economic or health problems will occur without the use of the pesticide, and (c) the time available from discovery or prediction of the pest outbreak is insufficient for a pesticide to be registered for the particular use. In determining whether an emergency condition exists, the Administrator will also give consideration to such additional facts requiring the use of section 18 as are presented by the applicant.

40 C.F.R. § 166.1 (1977).

The regulations establish three kinds of section 18 exemptions, but Mississippi has applied only for a so-called "specific exemption." "Specific exemptions" will be issued in situations "involving the outbreak of a pest in the United States." 40 C.F.R. § 166.2(a) (1977). This kind of exemption is to be distinguished from "crisis" and "quarantine-public health" exemptions, also granted under authority of FIFRA's section 18. "Crisis exemptions" are to be issued only "in situations involving the unpredictable outbreak of pests in the United States . . .." 40 C.F.R. § 166.2(c) (1977). "Quarantine-public health exemptions" are to be granted only to prevent the introduction or spread of a "foreign pest" in the United States. A "foreign pest" is one that "has become newly established, or threatens to become established . . .." 40 C.F.R. § 166.2(b) (1977).

Plaintiff contends that conditions (a) through (c) of 40 C.F.R. § 166.1 must be demonstrated before the EPA can find the existence of an "emergency." Defendants respond that the three conditions need not be met if the applicant presents additional, independent evidence of an emergency. The Court agrees with the defendants' interpretation. The second sentence of the quoted regulation must be given some meaning. The Court accordingly interprets the regulation to mean that the EPA may find the existence of an emergency in cases

where (a) through (c) have not been met. Conditions (a) through (c) may be sufficient conditions to the finding of an "emergency"; other conditions, however, may also prove sufficient in certain cases. This conclusion is buttressed by the *Federal Register's* preamble to these regulations:

While the Agency does not believe that under Section 18 we should limit by definition the right of any Federal or State agency to apply for an exemption, we agree that guidance should be given on the criteria the Agency intends to use in determining that an emergency condition exists . . .. The Agency will also give consideration to any additional facts requiring the use of Section 18 as are presented by the applicant.

38 Fed.Reg. 33304 (1973).

The plaintiff also contends that the legislative history to section 18, citing a quote by Rep. Kyl (a member of the Conference Committee), shows that that provision was intended only to cover the introduction of "new pest species." *See* 118 Cong.Rec. 35546 (1972). Defendants respond that the EPA's section 18 regulations, promulgated shortly after FIFRA's passage, evidence a contrary understanding. *See* 38 Fed.Reg. 33304 (1973). "Quarantine-public health exemptions" alone are limited in the way plaintiff would desire all section 18 exemptions to be circumscribed. As a nearly contemporaneous administrative interpretation of its statutory mandate, this regulatory framework is entitled to great weight by the Court. *See Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 326, 510 F.2d 692, 706 (1975). Logic also supports the agency's interpretation. Situations are conceivable where outbreaks of "old pests" could reach "emergency" proportions.

The Court is unwilling to find that the Administrator's finding of an "emergency" in this case was arbitrary or irrational. The Deputy Administrator found that, as of June 30, 1978 (the date when Mirex could no longer be applied), the fire ant infestation in Mississippi had reached "emergency" proportions since no adequate

alternative to Mirex, other than Ferriamicide, had yet been developed.

In support of her finding that fire ants pose "serious health and economic problems in Mississippi," the Administrator cited the severity of the ants' sting and the fact that some humans suffer extreme allergic reactions (occasionally fatal) to such stings. Also noted was the large number of Mississippi residents who in any season receive fire ant stings. Furthermore the Deputy Administrator referred to the fact that fire ant mounds (which can amount to 200 an acre) "physically interfere with agricultural equipment especially in areas with clay soils. The ants also have caused injury to farm workers and animals, and damage to pasture land and crops." The record is not unanimous on all these points, but, on balance, the Court cannot find the agency's decision to be irrational or capricious.

The Court can find no legal deficiency in the EPA's prediction that Mississippi's inability to apply Mirex after June 30 would exacerbate that state's fire ant difficulties. The EPA has found Mirex to be "very effective against fire ants." *See* "Summary of Evidence and Other Information and Statement of Reasons," 41 Fed.Reg. 56696, 56701 (Dec. 29, 1976). To be sure, the total area of fire ant infestation has greatly expanded since Mirex's application began. This fact, however, must be deemed irrelevant in the absence of a clear indication as to the extent of the infestation which would have resulted had there been no Mirex.

The Deputy Administrator's conclusion that no effective alternative treatment exists for large or heavily infested areas is neither arbitrary nor irrational and finds support in the record. The Deputy Administrator decided not to rely at all on those alternatives which are either more toxic or are carcinogenic and require far greater amounts of active ingredient per mound that does Ferriamicide. She also rejected those pesticides which had not yet been demonstrated to be effective. Lastly, she decided that those pesticides demanding the use of large amounts of water (such as Dursban) could not be considered feasible alternatives to Ferriamicide in large or heavily infested areas. She, however, determined that Dursban would be effective in small and lightly infested tracts; and, thus, with respect to such areas, disallowed use of Ferriamicide by non-certified applicators. The subject of alternatives to the control of fire ants is one about which the EPA has garnered considerable expertise over several years. Given the area's highly technical and scientific nature, the Court, absent a strong showing to the contrary, must defer to this expertise.

### Remand

While the Court accepts the technical expertise of EPA in its threshold determination of the emergency conditions created by the fire ant pest in Mississippi, it cannot ignore procedural defects which permeate the balance of the agency's rulemaking. The agency's technical expertise is normally given prevailing weight, because the procedures prescribed by the APA create a sense of confidence in the result by reason of the fact that they ensure interested parties a full opportunity to make submissions and respond to comments already made. Such confidence, however, cannot result if this full opportunity is denied, as where pertinent communications are received in secret by the agency. As stated by a unanimous panel in *United States Lines, Inc. v. Federal Maritime Commission,* 189 U.S.App.D.C. ——, at ——, 584 F.2d 519 at 542 (1978):

> [E]ven if the detailed contents of . . . *ex parte* contacts were revealed by the agency on judicial review, we would still be deprived of the benefit of an adversarial discussion among the parties. Our cases . . . make clear the critical role of adversarial comment in ensuring proper functioning of agency decisionmaking and effective judicial review. Such comment serves not only to clarify the issues and positions being considered at the agency level, but also to ensure that factual questions underlying the agency's decision are not raised, by necessity, for the first time on judicial review.

And adversarial comment is particularly critical where . . . *ex parte* communications are made by a party interested in securing [favorable agency action] . . . .

Although that case dealt with a statutory requirement of a "hearing," with a record that remained secret on court review, and with a "quasi-adjudicatory" proceeding, its quoted language logically applies to the instant case. To similar effect is *Home Box Office, Inc. v. F. C. C.*, 185 U.S.App.D.C. 142, 184–92, 567 F.2d 9, 51–59 (1977), which mandated the revelation of certain *ex parte* contacts made in the informal rulemaking context prior to the issuance of a final order. *See also Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 421, 541 F.2d 1, 49 n. 102, *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The place where the line is to be drawn between proper and improper *ex parte* communications has been the subject of considerable debate. *See Action for Children's Television v. F. C. C.*, 183 U.S.App.D.C. 437, 447–57, 564 F.2d 458, 468–78 (1977). Where, however, the information received *ex parte* is not generated internally by the agency, bears directly on highly complex technical issues, and will probably have some effect on the final outcome, it should be revealed for public comment before the agency reaches its decision.

■ In this instance substantial and perhaps decisive information relating to efficacy, health effects, and the conditions to be placed on the order was before the agency, despite having been submitted after the formal closing of the record. Much of this data was not the subject of adversarial comment because it remained unknown to plaintiff and was considered without plaintiff's knowledge. This unfortunate state of affairs necessitates a remand.

With respect to a good number of the documents and submissions at issue here, the EPA's procedural default could probably be deemed harmless. Through its own mechanisms, plaintiff was able to obtain many of the items in question long before the July 28 order. As it did on two occasions, plaintiff could have proffered its response to this information by formally petitioning to reopen the record. Many other items were probably neither "vital" nor "significant" to the Deputy Administrator's final order. *See United States Lines, Inc. v. F. C. C.*, supra at 36, 42; *Action for Children's Television v. F. C. C.*, supra, 183 U.S.App.D.C. at 455, 564 F.2d at 476.

Some unrevealed information, however, cannot be placed in the harmless error category. These items largely came to the agency's attention during June and July and, at least on their face, appear to be highly relevant. The Court is unfortunately unable to determine which of these documents had an impact on the shape of the Deputy Administrator's final decision and which did not. The Court must therefore assume that they all had an impact. Examples of items in this category are the American Farm Bureau's submission of July 18; Mississippi's June 5 report on the Kepone effects and manufactured content of Ferriamicide, and Mississippi's July 11 submission of certain Ames test data to the EPA.[3] EPA in fact admits it relied on two of these items.

Finally, of particular gravity in this regard, is Mississippi's so-called "Addendum to Exemption Request" submitted on June 21, 1978. By means of this document, Mississippi supplemented its exemption application with a request that the permissible ground broadcast of Ferriamicide be expanded to schoolyards, playgrounds, and levees. Plaintiff first became aware of this request, which was submitted to the agency long after the record had been finally closed, when the Deputy Administrator issued her final order responding favorably to most of Mississippi's June 21 application. The lack of earlier public notice of this request obviously cannot be deemed harmless. The ground broadcast portion of the

---

**3.** This last item offers an example of the evils attending the procedure followed here by the EPA. In its August 14 brief to this Court, plaintiff attached an affidavit from Professor Ames substantially discounting the probative value of Mississippi's submission. The agency, not the Court, should have been the first to receive this information.

EPA's order justifies nearly 60% of the total amount of Ferriamicide authorized. Most importantly, the Deputy Administrator, in approving most of Mississippi's new request, seems only to have considered dietary risks to potential consumers and dermal risks to applicators. Apparently not considered was the potential dermal risk which such ground broadcast would create for those unwitting children, women of childbearing age and others who came into direct contact with treated grounds. This point was raised by plaintiff for the first time in its briefs to the Court. If the EPA had immediately made public Mississippi's June 21 request, plaintiff could have made its point in time for the Deputy Administrator to have at least addressed it in the final order.

■ Finally, the anomalous situation is presented that highly relevant submissions in the agency's files are not considered by EPA to be part of the record as not relied upon in reaching its final order. No standard is given to explain this willingness to exclude from consideration pertinent material submitted as an integral part of the rulemaking process or otherwise located in EPA's own files. The agency may not, however, skew the "record" for review in its favor by excluding from that "record" information in its own files which has great pertinence to the proceeding in question.[4]

*Other Issues*

Despite the remand, two subsidiary issues raised by plaintiff will be resolved to limit the scope of future proceedings. These concern, first, the extent to which EPA was required to comply with the National Environmental Policy Act ("NEPA") before granting the exemption and, second, whether EPA's conduct was influenced by improper political intrusion into its functions.

**A. NEPA**

Since the Deputy Administrator's decision to grant a section 18 exemption for Ferriamicide could fairly be deemed a "major Federal action significantly affecting the quality of the human environment . . . .", plaintiff contends that the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (1976), requires that the EPA prepare and publish an Environmental Impact Statement ("EIS") on its exemption decision.

■ This contention is decisively answered by *Environmental Defense Fund, Inc. v. EPA,* 160 U.S.App.D.C. 123, 133, 489 F.2d 1247, 1257 (1973), which concluded that:

> [W]here an agency is engaged primarily in an examination of environmental questions, where substantive and procedural standards ensure full and adequate consideration of environmental issues, then formal compliance with NEPA is not necessary, but functional compliance is sufficient.

*See also Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 317–20, 486 F.2d 375, 384–87 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).[5] The required "functional equivalent" must reveal that "the five core NEPA issues" have been "carefully considered: the environmental impact of the action, possible adverse environmental effects, possible alternatives, the relationship between long- and short-term uses and goals, and

---

4. Plaintiff contends that arguably relevant information not in the agency's files but *potentially available* from third parties must be deemed part of the record. This contention is rejected. *See* H.R.Rep.No.92-511, 92d Cong., 1st Sess. 27 (1971) (an exemption may be granted "even though in some instances EPA might not possess the fully detailed information normally required").

5. Plaintiff argues that "functionally equivalent" statements are only to be permitted where the

particular action under review is "environmentally protective." This is incorrect. *Environmental Defense Fund v. EPA, supra,* hinged its allowance of a "functional equivalent" on whether the "*agency* is engaged primarily in an examination of environmental questions . . ." *Id.* 160 U.S.App.D.C. at 133, 489 F.2d at 1257 (emphasis supplied). *See also Maryland v. Train,* 415 F.Supp. 116, 121–22 (D.Md.1976), (applying "functional equivalence" rule to EPA order permitting sewage sludge dumping).

any irreversible commitments of resources . . . ." *Environmental Defense Fund v. EPA, supra,* 160 U.S.App.D.C. at 132, 489 F.2d at 1256. Such "careful consideration" must, though, take into account the emergency nature of section 18 of FIFRA. NEPA is not to be read inconsistently with any other statutory provision. *United States v. SCRAP,* 412 U.S. 669, 694, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Flint Ridge Development Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 788–91, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). In this case, NEPA cannot be interpreted as requiring rigorous proof with respect to each of the aforementioned "core issues." Such would "contravene the purpose" (*see id.,* at 791, 96 S.Ct. 2430) of section 18 which is to allow the EPA to act quickly even in the absence of dispositive proof. *See* H.R.Rep.No.92–511, 92d Cong., 1st Sess. 27 (1971). *See also Dry Color Mfgr's Ass'n v. Department of Labor,* 486 F.2d 98, 107–08 & n. 15 (3d Cir. 1973).[6]

 The Deputy Administrator's final order demonstrates the needed careful consideration of NEPA's "core issues." Each of the pertinent "core issues" was discussed in the document and, as the extensive record demonstrates, was considered by the agency.[7] The purpose behind NEPA is "to compel federal agencies to give serious weight to environmental factors in making discretionary choices. . . ." *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697 (2d Cir. 1972). That objective has been satisfied here.

Contrary to plaintiff's assertion, nothing in EPA's regulations requires the preparation of an EIS preparatory to the agency's grant of this section 18 exemption. It is true that the regulations cited by plaintiff require the EPA to prepare EIS's in certain circumstances. 40 C.F.R. Part 6 (1977). The situation before the Court, however, is

just not one of those circumstances. *See id.* §§ 6.100(b), 6.106 & 6.600 (1977).

### B. *Improper Political Influence*

Plaintiff urges that the order be set aside in its entirety because political pressures were brought upon the agency in favor of Mississippi's application and materially affected EPA's final decision. The agency vigorously denies any impropriety. Not disputed is the fact that congressmen from fire ant infested areas have shown an intense interest in the agency's proceedings and have vigorously urged a favorable response to Mississippi's application. The agency has disclosed to the Court all papers in its files reflecting communications from interested congressmen. None of these communications on its face reflects any impropriety. In addition, plaintiff points to various intra-executive branch communications showing an awareness on the part of the agency of the political implications of any Ferriamicide decision.

Plaintiff relies primarily on *D. C. Federation of Civil Ass'ns v. Volpe,* 148 U.S.App. D.C. 207, 459 F.2d 1231, *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), as well as a series of cases best represented by *Pillsbury Co. v. FTC,* 354 F.2d 952 (5th Cir. 1966). These authorities are not persuasive. To begin with, it must be emphasized that the Court is not faced with *ex parte* communications made in a formal adversarial context. The agency was engaged in informal rulemaking in an area where Congress has delegated to it broad discretionary powers. Moreover, unlike the situation considered in *D. C. Federation,* the communications here from interested congressmen were directly relevant to the agency's proceeding. The congressmen concerned largely came from areas where the fire ant problem is severe and properly

---

6. If the "functional equivalent" requirement means anything, it surely means that the EPA did not have to follow the detailed procedural requirements laid out by NEPA. The Court thus rejects plaintiff's contention that the EPA should have circulated for comment a draft assessment of the environmental impact of Ferriamicide use prior to its final order.

7. There was no legal error in the EPA's refusal to consider the cumulative effects which might result were Ferriamicide use permits granted to the eight other states that have also applied for section 18 exemptions. *See Kleppe v. Sierra Club,* 427 U.S. 390, 409–15 & 414 n. 26, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

brought to the agency's attention the concerns of their respective constituencies. These concerns are relevant to whether or not an "emergency" exists and to the benefits to be derived from Ferriamicide use. It should be noted that section 18 of FIFRA directs the EPA to "consult with . . . the Governor" of a requesting state. This provision, added by Pub.L.94–140, 89 Stat. 754 (1975), was part of a general attempt to force the EPA to consider factors other than the environment—particularly agricultural interests—in its implementation of FIFRA. *See generally* H.R.Rep.No.94–497, 94th Cong., 1st Sess. 6–7, 11 (1975); 121 Cong.Rec. 36113–14 (1975) (statement of Sen. Allen). The consideration of comments from congressional sources obviously coincides with Congress's overriding intention in 1975 that all relevant information concerning the use or nonallowance of pesticides be brought to EPA's attention. *D. C. Federation* makes clear that the agency must reach its decision on the exemption strictly on the merits "without reference to irrelevant or extraneous considerations." 148 U.S.App.D.C. at 224, 459 F.2d at 1248. Given the record before the Court, it appears that the EPA has attempted to follow this mandate. It should in fact be noted that some suggestions given by congressional sources as to the appropriate content of a final Ferriamicide order were not accepted by the agency. *See American Public Gas Ass'n v. FPC,* 186 U.S.App.D.C. 23, 77, 567 F.2d 1016, 1070 (1977). Also, unlike the agency action under review in the *D. C. Federation* case (*id.,* 148 U.S.App.D.C. at 213, 459 F.2d at 1237), there is a contemporaneous explanation of the agency's action in this case. Finally, the degree of congressional interference in this case pales in comparison to that which occurred in the cases cited by plaintiff.

 Plaintiff, suspecting greater congressional influence than suggested by the written record, presses for an opportunity to engage in extensive discovery into all aspects of the decisional process, searching out in various ways the extent and nature of the political activity that preceded the decision. This Court is of the view that a much stronger showing than has been made must be presented before a court should lend its support to such an inquiry. The Court has been frequently instructed that it is not within its authority to inquire into the decision-making process itself unless there exists "a strong showing of bad faith or improper behavior . . ." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. at 825. Political influence in the improper sense of the term is an easy charge to make; the mere making of that accusation though must not serve to allow those disappointed by regulatory activity to invoke all of the benefits of the rules of civil procedure for an extensive search into the agency's decisional processes. The Court is of the view that the requisite "strong showing" has not been made to justify such discovery and that further inquiry into the allegations of political influence is unwarranted and will not be authorized.

On the remand, the agency would be well advised to exclude from its deliberations all congressional pressures extraneous to the issues to be decided. This would assure the public and any reviewing court that the agency had conscientiously lived up to the responsibilities delegated to it by Congress.

*Conclusion*

In view of the foregoing, summary judgment is granted the defendants on the issue of whether or not there existed "emergency conditions" within the contemplation of section 18 of FIFRA, on EPA's fulfillment of its NEPA obligations, and on the alleged effect of improper political influences. On all other issues, the matter is remanded to the agency for reason of its failure to follow the procedures prescribed by section 4 of the APA. If EPA wishes to pursue further its consideration of Mississippi's application, it will have to publish notification in the *Federal Register* of a new notice and comment period. Such period need not last longer than 10 days following such publication. During this period, comments may be submitted which respond to the matters received *ex parte* by the EPA since January

23, 1978, and may introduce any new information relevant to the issues still remaining open. As of the date of the aforementioned *Federal Register* notice, the EPA shall establish and maintain a file available for public inspection with respect to Mississippi's application. This file shall contain all material which has been submitted to this Court by the parties and all information received during the new comment period.

SO ORDERED.