**WARREN COUNTY, Plaintiff,**

v.

**STATE OF NORTH CAROLINA, et al., Defendants.**

**No. 79–560–CIV–5.**

United States District Court,
E. D. North Carolina,
Raleigh Division.

Nov. 25, 1981.

---

Norman B. Smith, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro,

N. C., Charles T. Johnson, Jr., Warrenton, N. C., for plaintiff.

W. A. Raney, Jr., Sp. Deputy Atty. Gen., James L. Blackburn, U. S. Atty., N. C. Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM OPINION

BRITT, District Judge.

This action was instituted in the Superior Court of Warren County, North Carolina, on 16 August 1979 by Warren County against the State of North Carolina; Herbert Hyde, Secretary of the North Carolina Department of Crime Control and Public Safety; Harlan Boyles, Treasurer of the State of North Carolina; and Carter C. Pope and wife, Linda W. Pope.[1] The action would prevent a tract of land in Warren County from being used as a landfill for the disposal of soil contaminated with polychlorinated biphenyls (hereinafter PCBs). In the original complaint, four causes of action are alleged:

1. The disposal of the PCBs constitutes a public nuisance.

2. The site approval by the Environmental Protection Agency (EPA) is defective in that it contains impermissible waivers of EPA regulations.

3. Defendants failed to prepare and publish an Environmental Impact Statement (EIS) pursuant to N.C. Gen.Stat. § 113A–4(2).

4. The decision to establish the landfill was arbitrary and capricious and should be set aside.

An amendment to complaint, filed 23 August 1979, added as a fifth cause of action that the proposed landfill violates a Warren County ordinance prohibiting the disposal of PCBs anywhere in the county.[2]

On 17 September 1979 plaintiff filed a supplement to amendment to complaint adding as a party defendant John C. White,[3] Regional Administrator of Region IV of the EPA, and alleging, as a part of its third cause of action, failure to prepare and publish an EIS as required by federal statute (42 U.S.C. § 4332).

On 12 March 1981 a supplemental complaint was filed seeking, as a sixth cause of action, court review of the adequacy of the EIS filed by the State of North Carolina.

Plaintiff seeks injunctive relief permanently enjoining the use of the proposed landfill as a PCB disposal site. A preliminary injunction issued by Honorable Charles Lamm, North Carolina Superior Court Judge, now enjoins any use of the site for PCB disposal, although it does permit testing of the soil.[4]

After the federal defendant was added, the action was removed to this Court pursuant to 28 U.S.C. § 1441.

Answers and motions for summary judgment have been filed by both the State[5] and federal defendants.[6] The answers set forth various defenses, including a challenge to plaintiff's standing, some of which will be referred to in the course of this opinion.

In its answer to the sixth cause of action, the State admitted that in the final EIS it had failed to specifically address plaintiff's comments to the draft EIS and to attach a

1. The owners of the tract of land on which the State proposes to construct the landfill.

2. The amendment to complaint also substitutes Burley B. Mitchell, Jr., for Herbert Hyde as a named defendant, Mitchell having succeeded Hyde as Secretary of the Department of Crime Control and Public Safety.

3. Subsequently succeeded by Rebecca W. Hamner who was substituted as party defendant.

4. An earlier temporary restraining order had prohibited the sale of the land by defendants Pope or the expenditure of State funds by de-

fendant Boyles for its purchase by the State. This was later dissolved and the State acquired title to the property on 30 August 1979 by deed recorded in Book 328, page 86, Warren County Registry. This action is, therefore, moot as to defendants Pope and Boyles, and an order of dismissal as to them will be entered.

5. The State of North Carolina and Burley B. Mitchell, Jr.

6. Rebecca W. Hamner, Regional Administrator, EPA.

copy thereof as required by state regulations.[7] Subsequently an addendum was filed to the final EIS in which the State contends it has cured those defects. Time for filing affidavits for consideration by the Court on the motions for summary judgment has now expired and the matter is ripe for disposition.

## I

## FACTUAL BACKGROUND

In June 1978 liquid materials containing PCBs were discharged onto roadsides on the military reservation at Fort Bragg, in Cumberland County, near Fayetteville, North Carolina. Shortly thereafter, complaints were received from various areas of Eastern and Piedmont North Carolina of like occurrences. From Warren, Johnston and Harnett Counties in the East and from Lee, Chatham and Person Counties in the Piedmont reports came into Raleigh of areas of roadsides saturated with an oily substance, later identified as containing PCBs. In all, fifty-one separate sites in fourteen counties[8] were sprayed with the contaminant. A thorough investigation by state and federal officials determined that the substance was used oil removed from transformers at Ward Transformer Company in Raleigh and disposed of by a private contractor. Federal indictments arising out of the incidents resulted in guilty pleas or verdicts of guilty against all of those allegedly involved.

As soon as the substance was identified as PCB, studies and tests were begun to determine the safest, most feasible, and most economical way of ridding the 211 miles of roadside of the dangerous chemical.[9] Knowledgeable experts in the field were either brought in or contacted in an effort to determine whether it would be best to treat the soil where it lay[10] or remove it for burial or incineration.[11]

By eliminating all alternatives, it was determined that burial in an approved landfill must be carried out. Thus, the task began of selecting a suitable site. Utilizing some general criteria and technical requirements of EPA,[12] ninety potential sites in twenty counties were considered before the Warren County site was chosen. To confirm its evaluation of the site, the State had additional tests performed by an independent consulting firm and then sought EPA approval. It is not clear from the record when the proposed disposal site in Warren County was selected. On 12 December 1978 defendant North Carolina submitted its application to defendant White for approval. A public hearing was held on 4 January 1979 in Warrenton, North Carolina, concerning the selection of a disposal site, at which oral and written comments from the public were accepted. As a result of information submitted by Dr. Charles Mulchi, review of defendant North Carolina's application was halted pending verification of that information. On 25 January 1979 defendant White directed defendant North Carolina to engage in further soil sampling and testing. Defendant North Carolina submitted the results of these tests to the EPA on 8 and 20 March 1979. Defendant White approved the conceptual design of the disposal site in Warren County on 4 June 1979 pursuant to the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.

---

7. 1 N.C.Ad.Code § 25.0206(e) (1979).

8. Halifax, Warren, Franklin, Nash, Wake, Johnston, Wilson, Edgecombe, Harnett, Person, Granville, Lee, Chatham, Alamance and Cumberland.

9. Laboratory tests indicate that PCBs are carcinogenic.

10. This proved not to be feasible as EPA regulations prohibit in-place treatment, and efforts by the State to have this rule changed were unsuccessful.

11. The only incinerators capable of doing the job are located in New Jersey, Arkansas and Texas, and they had not been issued permits by EPA. Additionally, this method would be cost prohibitive.

12. Considered, by way of example, were relative contiguousness to the spill sites, the topography, soil type, hydrology, site size, access and population density surrounding the site.

## II

## STANDING OF WARREN COUNTY

■ The challenge to plaintiff's standing necessitates an analysis by this Court of a basic jurisdictional requirement. As a threshold question, a litigant satisfies the Article III requirement of a case or controversy only if the litigant alleges a personal stake sufficient "to assure that concrete adverseness which sharpens the presentation of issues . . ." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). This constitutional minimum mandates a litigant to show a personal stake which warrants "*his* invocation of federal court jurisdiction and [justifies] exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). A second, nonconstitutional, requisite involves the party's interest being "within the zone of interests to be protected or regulated" by the statute under which its claim arises. *Association of Data Processing Service Organizations, Inc., v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1978). Plaintiff. must meet both requirements to have standing.

■ Plaintiff alleges that it owns land near the proposed disposal site. In addition, this Court takes notice that establishment of a disposal area for PCBs in the county could have potentially adverse effects on the tax base, population level and overall environmental quality of the county. Thus, plaintiff satisfies the initial threshold requirement imposed by the Constitution of an injury in fact.

■ The second requirement is not so easily resolved. Since this action involves the alleged violation of several statutes, the most efficient treatment of this issue flows from a separate analysis of each cause of action. A critical aspect underlying this entire inquiry is that since "[s]tatutory rights and obligations are established by Congress, . . . it is entirely appropriate for Congress . . . to determine in addition who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). Since plaintiff's standing depends upon the statutory basis upon which it proceeds, the Court will examine each cause of action separately.

■ In its initial cause of action, plaintiff seeks to abate a public nuisance. N.C. Gen.Stat. § 130–20 (1981). The statute authorizing judicial action to abate a public nuisance explicitly vests the power to initiate such action in the local health director alone. *Id.* When the legislature creates specific rights and obligations apart from those embodied in the Constitution, that body may determine who may enforce them and in what manner. *Davis v. Passman*, 442 U.S. at 241, 99 S.Ct. at 2274 (1979). Inasmuch as the North Carolina General Assembly clearly denominated the local health director as the proper plaintiff in an action to abate a public nuisance, Warren County lacks standing to proceed under the statute.[13] *See Dare County v. Mater*, 235 N.C. 179, 69 S.E.2d 244 (1952) (holding that a county could not bring suit where a statute specifically required an action to be prosecuted in the name of the State).

The second cause of action alleges a violation of the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* (1976), which provides two avenues for judicial review. *Id.* §§ 2618, 2619. The provision applicable to this lawsuit, which vests jurisdiction in the federal district courts, provides for "citizens' civil actions" by "any person." *Id.* § 2619(a). For the purposes of ascertaining standing to sue, this Court must determine whether a county is a person in the context of this legislation. This issue is apparently a novel question, requiring detailed analysis.

■ If the county were permitted to file a citizens' suit under this provision, it would be acting in a representative capaci-

---

**13.** The first cause of action would survive had the local health director been joined as a party. Fed.R.Civ.P. 19. The Court on its own initia-

tive and in the interests of justice joins the local health director, Fed.R.Civ.P. 21, to allow it to reach the merits on this issue.

ty—on behalf of its citizens. While states have been accorded standing in federal courts under the doctrine of *parens patriae, Prince George's County, Maryland v. Levi,* 79 F.R.D. 1, 3 (D.Md.1977), *citing North Dakota v. Minnesota,* 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923); *Louisiana v. Texas,* 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900), this doctrine has not been extended to counties. Counties, as political subdivisions of the state, have only those powers necessary to the accomplishment of their declared objectives. *Moody v. Transylvania County,* 271 N.C. 384, 156 S.E.2d 716 (1967); *Jefferson Standard v. Guilford County,* 225 N.C. 293, 34 S.E.2d 430 (1945). The powers are not sovereign but derivative, owing to their creation by the legislature. *See In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 131 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *rehearing denied,* 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974); *Prince George's County,* 79 F.R.D. at 4. The State would be the proper party, as *parens patriae,* to seek vindication of the federal statutory right provided in the Toxic Substances Control Act. Warren County may not maintain its second cause of action as *parens patriae* of its residents.

■ Furthermore, the wording of the provisions for citizen initiation of judicial review clearly contemplates *private* judicial action. 15 U.S.C. § 2619(a) & (c)(3). Although this wording would not prevent a class action by a group of citizens or a suit by an organization on behalf of its members, *see, e.g., United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), this Court declines to permit the county to proceed in this fashion. "To do so would simply restate the concept of standing as *parens patriae* in a way that avoided its limitations . . ., and would not demonstrate that plaintiff has the personal stake in the outcome of this controversy which organizational plaintiffs must have along with all other plaintiffs." *Prince George's*

*County,* 79 F.R.D. at 5 (citation omitted). *But see City of Milwaukee v. Saxbe,* 546 F.2d 693, 698 (7th Cir. 1976) (granting municipalities associational standing). Given the theoretical limitations of standing as *parens patriae,* it would be inappropriate for plaintiff to have standing as an organization under this provision.

Finally, a distinction should be noted between this legislation and the National Environmental Policy Act (NEPA). The latter legislation with its broad purpose clearly enunciated, *see* 42 U.S.C. § 4331(a) (1976), sets no limitation on civil actions to enforce its provisions. The toxic substances law, however, expressly provides who may bring actions for enforcement. 15 U.S.C. §§ 2618 & 2619. This explicit limitation demonstrates the intention of Congress to direct the proper parties to and forums for judicial review, a determination entirely proper for Congress to make. *Davis v. Passman,* 442 U.S. at 251, 99 S.Ct. at 2280. When Congress speaks so clearly, the federal courts must heed its words. Accordingly, plaintiff has no standing to enforce the provisions of the Toxic Substances Control Act.[14]

■ The third cause of action, involving the failure to prepare an environmental impact statement, became moot when such a statement was filed. *See* section III (2), *infra.* Therefore, the Court need not consider plaintiff's standing on this cause of action. Plaintiff has amended this claim, however, to allege failure of the federal defendants to prepare and file an EIS under NEPA. Counties have standing under NEPA to challenge actions which might be harmful. *See, e.g., McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975). Warren County may bring this amended claim.

■ In the fourth cause of action, plaintiff claims the decision to establish the landfill was arbitrary and capricious and seeks review under the North Carolina Administrative Procedure Act (NCAPA). N.C.Gen. Stat. § 150A–43 (1978). This statute re-

---

14. The Court considers this issue, however, in the companion case where individual residents of Warren County raise an identical claim. *See*

*Twitty v. State of North Carolina,* 527 F.Supp. 778 (E.D.N.C.1981).

quires a four-part test for standing: an aggrieved party, a final agency decision, a contested case, and exhaustion of administrative remedies. *Id.* *See Orange County v. North Carolina Department of Transportation,* 46 N.C.App. 350, 360, 265 S.E.2d 890, 898, *disc. review denied,* 301 N.C. 94, 273 S.E.2d 299 (1980). If Warren County satisfies these criteria, it may obtain judicial review under the North Carolina statute.

■ A North Carolina court has ruled that a county is an aggrieved party under NCAPA due to the effect on its tax base and planning jurisdiction. *Orange County,* 46 N.C.App. at 361, 265 S.E.2d at 899. Accordingly, plaintiff is an aggrieved party because of the potential harm resulting from the establishment therein of a disposal site for PCBs.

The second requirement of a final agency decision is likewise satisfied. The thrust of plaintiff's case is the adequacy of the environmental impact statement. With the issuance of that statement, a final agency determination has been made for the purposes of NCAPA. The challenge to agency action, based upon the environmental impact statement, is ripe for judicial review.

The third criterion mandates that the issue involve a contested case. *See* N.C.Gen. Stat. § 150A–2 (defining contested case). The North Carolina Environmental Policy Act (NCEPA) broadens "the definition of 'contested case' and [expands] the scope of procedural remedies available under [NCAPA], including the right to judicial review." *Orange County,* 46 N.C.App. at 375, 265 S.E.2d at 906–07. Based on the analysis and reasoning of *Orange County* this Court finds that the issue involved in the case at bar is a contested case.

Finally, plaintiff must exhaust its administrative remedies. NCEPA provides no specific administrative procedures through which an aggrieved party may challenge the environmental impact statement. *See* N.C.Gen.Stat. § 113A–1 *et seq.* (1978). With no statutory remedies available, exhaustion is no barrier to plaintiff's seeking judicial review. Having satisfied the four requirements of NCAPA, plaintiff has standing to litigate its fourth cause of action.

■ In its fifth cause of action, plaintiff seeks enforcement of a Warren County ordinance prohibiting the disposal of PCBs in Warren County. Assuming *arguendo* the validity and applicability of such county action under the laws of North Carolina, the county would be the logical entity to enforce its rules. On the facts presented in this case, Warren County has standing to seek enforcement of its ordinance.

The sixth and final cause of action requests this Court to review the environmental impact statement, alleging that the statement is defective under NCEPA. N.C. Gen.Stat. § 113A–1 *et seq.* (1978). The issue of standing for a county to proceed under this Act has not been addressed directly by the North Carolina courts. *Compare Orange County,* 46 N.C.App. 350, 265 S.E.2d 890 (1980) (permitting a county to proceed as a plaintiff in challenging an environmental impact statement under the North Carolina Administrative Procedure Act).

■ Substantial aid in this analysis flows from several determinations of a county's standing under the National Environmental Policy Act. Generally, the basic two-part standing analysis applies. First, the county must sustain an injury in fact. *See Association of Data Processing,* 397 U.S. at 152, 90 S.Ct. at 829. Where a county suffered potential decreases in tax revenues and population, as well as a decline in the quality of human environment, it established an injury sufficient to satisfy this first requirement. *McDowell v. Schlesinger,* 404 F.Supp. 221, 243–44 (W.D.Mo. 1975). Without considering the merits, the potentially harmful effects of disposing toxic wastes in Warren County suffice to establish an injury in fact. The adverse impact can potentially reach its tax base and population. At the very least, consequences may reach the quality of the county's environment.

Secondly, the interest which the county seeks to secure must fall "within the zone

of interests sought to be protected by the statute...." *Association of Data Processing*, 397 U.S. at 153, 90 S.Ct. at 830. Under the federal environmental legislation, this zone of interests encompasses many varied perspectives due to the broad policy of the Act to "fulfill the social, economic and other requirements of present and future generations of Americans." National Environmental Policy Act of 1969, § 101(a), 42 U.S.C. § 4331(a) (1976). Based upon this far-reaching policy, counties fall within the zone of interests sought to be protected by the Act. *McDowell*, 404 F.Supp. at 244.

North Carolina's version of environmental legislation pursues a similarly broad goal. The legislature acted,

recognizing the profound influence of man's activity on the natural environment, and desiring, in its role as trustee for future generations, to assure that an environment of high quality will be maintained for the health and well-being of all, declares that it shall be the continuing policy of the State of North Carolina to conserve and protect its natural resources and to create and maintain conditions under which man and nature can exist in productive harmony. Further, it shall be the policy of the State to seek, for all of its citizens, safe, healthful, productive and aesthetically pleasing surroundings; to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety; and to preserve the important historic and cultural elements of our common inheritance.

N.C.Gen.Stat. § 113A–3 (1978). Given the express legislative decree of its wide-ranging purpose, Warren County surely falls within the zone of interests protected under this statute. Since the "issues obviously directly affects [the county's] environment and are clearly within the zone of interest of the [legislation]," *Prince George's County, Maryland v. Holloway*, 404 F.Supp. 1181, 1185 (D.D.C.1975), Warren County has standing to proceed under the sixth cause of action. *Accord, City & County of San Francisco v. United States*, 443 F.Supp. 1116, 1125–26 & n.11 (N.D.Cal.1977), *aff'd,*

615 F.2d 498 (9th Cir. 1980). Having considered the jurisdictional challenges relating to plaintiff's standing, the Court proceeds to the merits.

### III

### DECISION

### (1)

■ In its first cause of action, plaintiff alleges that the storage of PCBs on the tract of land "... will constitute a public nuisance, because of its danger to human health and life."

In the case of *Ferris v. Wilbur*, 27 F.2d 262 (4th Cir. 1928), individual property owners adjacent to a naval mine depot in York County, Virginia, sought to enjoin the storage of high explosives therein. Judge Parker, writing for the Court in that case, said, *inter alia* :

... [I]n this case the land upon which the explosives are to be stored belongs to the government, and the only injury which complainants apprehend is injury arising out of the government's use of its own property. The question is whether such use authorized by act of Congress can be enjoined by the courts as a nuisance. The question, we think, answers itself. Of course, if what is done by officials under authority of law amounts to a taking of private property for public use, the owner is entitled to recover just compensation in a proper proceeding....

But it is unthinkable that the courts should enjoin as a nuisance the use of government property by a co-ordinate branch of the government, the executive, where such use is authorized by a valid act of the other co-ordinate branch, the legislative. It is elementary that courts will not enjoin as a nuisance action authorized by valid legislative authority....

*Id.* at 264–65. Plaintiff does not contend that the Toxic Substances Control Act is unconstitutional or that the regulations promulgated thereunder contravene or exceed the authority delegated. Thus, the use by the State of North Carolina of its own

property in a manner authorized by valid legislative authority may not be enjoined by the courts as a nuisance.

(2)

Plaintiff's third cause of action, as originally stated, attacked the failure of the state defendants to prepare and publish an EIS as required by North Carolina law. The subsequent filing of such a statement renders this phase of that cause of action moot.[15] However, as part of its supplement to amendment to complaint [16] plaintiff challenges the failure of the federal defendant to prepare and publish an EIS as required by 42 U.S.C. § 4332.

NEPA requires all agencies of the federal government to include, in every recommendation or report on proposals for major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on the environmental impact of the proposed action. 42 U.S.C. § 4332(2)(C)(i). Some statutory exceptions exist, see id. § 4332(2)(D), but these exceptions concern federal action funded under a program of grants to states and are, therefore, not applicable in this case.

One exception to the requirement that federal agencies prepare an environmental impact statement has been carved out by the courts. Known as the functional equivalency test, it provides that where a federal agency is engaged primarily in an examination of environmental questions, and where substantive and procedural standards ensure full and adequate consideration of environmental issues, then formal compliance with NEPA is not necessary, functional compliance being sufficient. Although there are no cases holding that the EPA does not have to file an environmental impact statement before making a decision under the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., there are numerous cases concerning other environmental statutes which hold that the EPA is not re-

quired to file an environmental impact statement. *See, e.g., Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 54 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (Clean Air Act); *Wyoming v. Hathaway,* 525 F.2d 66, 70 (10th Cir. 1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976) (Federal Insecticide, Fungicide and Rodenticide Act); *Indiana & Michigan Electric Co. v. Environmental Protection Agency,* 509 F.2d 839, 843 (7th Cir. 1975) (Clean Air Act): *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 676 (1st Cir. 1974) (Clean Air Act); *Environmental Defense Fund v. EPA,* 489 F.2d 1247, 1257 (D.C.Cir.1973) (Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 135 et seq.); *Essex Chemical Corp. v. Ruckelshaus,* 486 F.2d 427, 431 (D.C.Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (Clean Air Act); *Portland Cement Assoc. v. Ruckelshaus,* 486 F.2d 375, 384 (D.C.Cir.1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), *subsequent appeal,* 513 F.2d 506 (1975) (Clean Air Act); *Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973) (Clean Air Act); *Buckeye Power, Inc. v. Environmental Protection Agency,* 481 F.2d 162 (6th Cir. 1973), *subsequent appeal,* 523 F.2d 16 (6 Cir. 1975) (Clean Air Act); *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 650 (D.C.Cir.1973) (Clean Air Act); *Appalachian Power Co. v. Environmental Protection Agency,* 477 F.2d 495 (4th Cir. 1973) (Clean Air Act); *Environmental Defense Fund, Inc. v. Blum,* 458 F.Supp. 650 (D.D.C.1978) (Federal Environmental Pesticide Control Act); *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board,* 453 F.Supp. 122, 124 (E.D.Va.1978) (Federal Water Pollution Control Act); *Maryland v. Train,* 415 F.Supp. 116, 121 (D.Md.1976) (Ocean Dumping Act).

Plaintiff contends that the functional equivalency test has been applied in situations involving the Clean Air Act because that Act provides specific deadlines for

---

**15.** The sufficiency of that EIS is challenged in the sixth cause of action and is dealt with in part III(5) of this opinion.

**16.** Filed 17 September 1979.

agency action and, therefore, those cases can be regarded as falling within an "emergency" exception to the environmental impact statement requirement of NEPA. However, the functional equivalency test has been applied to several other environmental statutes, not because of any purported need for haste but simply because the environmental impact statement requirement was deemed to be superfluous in view of the EPA's otherwise equivalent action through consideration of environmental concerns under the statutes.

Plaintiff cites *Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), for the proposition that where a federal licensing or permitting agency authorizes a non-federal entity to take a certain action, and that entity prepares its own environmental impact statement, the federal agency must nevertheless prepare an environmental impact statement. Although *Greene* does set forth this rule, that case involved· the Federal Power Commission, not the Environmental Protection Agency, and is clearly distinguishable.

▮ Plaintiff contends that the functional equivalency test has been applied only in lawsuits brought by polluters against the EPA trying to retard, minimize and prevent measures adopted by the agency for the protection of the environment and that the test does not apply to a case brought by a unit of the government whose sole concern is the protection of the health and lives of its citizens. This contention is without merit, because application of the functional equivalency test hinges on whether the *agency* is engaged primarily in an examination of environmental questions. *Environmental Defense Fund, Inc. v. Blum*, 458 F.Supp. 650, 661 n.5.

Plaintiff contends that the cases applying the functional equivalency test rely strongly on the fact that procedures were carried out by the agency in advance of the regulatory decision in question, which were the "functional equivalent" of an environmen-

tal impact statement, but that no such procedures were carried out by the EPA in this case. Specifically, plaintiff complains that "no statement comparable to that required under the Clean Air Act has been filed by the EPA, nor was the single hearing at which citizen complaints were received . . . structured in such a way that the core NEPA issues were addressed."

▮ This contention is without merit. Although nothing *requires* the EPA to hold hearings in such cases, a ·review of the record reveals that the hearing adequately afforded the public, including plaintiff, the opportunity to participate in the decision-making process and that the EPA fully considered all matters brought to its attention before making its final decision. This meets the test of functional equivalence. In addition, the EPA is not required to file a formal environmental impact statement under the functional equivalence doctrine. *Environmental Defense Fund v. EPA*, 489 F.2d at 1256; *International Harvester Co. v. Ruckelshaus*, 478 F.2d at 650.

(3)

The fourth cause of action alleges that the EPA acted without a reasonable basis when it found certain regulatory criteria to have been satisfied by the Warren County disposal site. Plaintiff supports this contention with the affidavit of Dr. Charles Mulchi [17] who concludes that the decision to locate the PCB disposal site in Warren County was unreasonable and arbitrary.

▮ In reviewing EPA's approval of the disposal site, the Court must determine whether the decision was arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In applying this standard:

[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although inquiry into the facts is to be searching and careful, the ultimate stan-

**17.** Dr. Mulchi holds a Ph.D. in Soil Science and specializes in environmental chemistry.

dard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If the Court concludes that there is a rational basis for the decision approving the disposal site, EPA's decision must be upheld. Judicial review of an agency action is to be confined to the record on which the decision was made. *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976). "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

Additionally, when dealing in a highly technical area particularly within the expertise of the EPA, the agency's interpretation of its regulations should be given great weight by the Court. *Federal Power Commission v. Florida Power & Light Co.*, 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 *reh. denied*, 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972); *Citizens Against the Refinery's Effects, Inc. v. United States Environmental Protection Agency*, 643 F.2d 178 (4th Cir. 1981). In *Citizens Against the Refinery's Effects* the Fourth Circuit refused to examine in great detail the technical modeling data submitted to EPA and also refused to consider other data outside the administrative record. The Fourth Circuit stated that in a disagreement of experts, the discretion of the federal agency is to be given great weight, absent evidence of arbitrary and capricious actions. *Id.* at 181–82. Based on this standard of review, the Court holds that plaintiff has failed to prove that the decision of the EPA was arbitrary, capricious or otherwise not in accordance with law.

(4)

Plaintiff's fifth cause of action asserts that the proposed landfill violates a Warren County ordinance. That ordinance, enacted on 21 August 1978, provides, in part, as follows:

WHEREAS, polychlorinated biphenyls, (hereinafter referred as PCB's) are highly toxic substances, which are imminently dangerous to human health and life and are widely distributed in the environment; and

WHEREAS, efforts are made from time to time to store, dump, and otherwise dispose of PCB's in various places; and

WHEREAS, Warren County is peculiarly unsuited for the disposition of PCB's because there is a generally high ground water table in the county and most of the soils of the county are highly permeable, so that there is a substantial likelihood that if stored or disposed of in the county, PCB's would eventually seep into the ground water supply, where they would constitute an extreme danger to human health and life; . . .

BE IT NOW THEREFORE enacted and ordained by the County of Warren that . . .

No PCB's, or substances or materials containing a measurable amount (other than a trace) of PCB's shall be stored, dumped, or otherwise disposed of within the boundaries of Warren County.

Plaintiff asserts that this ordinance is not preempted by federal or state legislation and is specifically authorized by the Toxic Substances Control Act. Plaintiff relies on two provisions of this act for the proposition that the Warren County ordinance was not preempted by federal law. The first provision provides that a requirement prohibiting or otherwise regulating any manner or method of disposal of a hazardous chemical substance "may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision. . . ." 15 U.S.C. § 2605(a)(6)(B). The other section provides, in part, that

[I]f the Administrator prescribes a rule or order . . . which is applicable to a chemical substance or mixture, and which is designed to protect against a risk of

injury to health or the environment associated with such substance or mixture, no State or political subdivision of a State may, after the effective date of such requirement, establish or continue in effect, any requirement which is applicable to such substance or mixture, or an article containing such substance or mixture, and which is designed to protect against such risk unless such requirement ... prohibits the use of such substance or mixture in such State or political subdivision.

*Id.* § 2617(a)(2)(B).

■ By enactment of these statutes, it is clear that Congress intended to give states and localities some leeway to impose more stringent disposal requirements than those provided for by federal regulation. However, the issue for determination here is whether Congress intended to confer upon counties and other local governments the authority to totally frustrate the PCB disposal program through the implementation of total disposal bans. Defendants contend that the better interpretation of the statutes is that they authorize only those state and local regulations which are consistent with national disposal objectives; that is, regulations which impose requirements reasonably dictated by local geographical or other physical conditions.

On 31 May 1979 EPA's position on preemption was defined at 44 Fed.Reg. 31514, 31528 (1979):

In the Disposal and Marking Rule, EPA stated that State and local requirements regarding disposal of PCBs are exempt from Federal preemption as long as the requirements are not less restrictive than those prescribed by EPA. EPA took this position to avoid interfering with existing PCB disposal requirements in Michigan, Oregon, Indiana, Minnesota and Wisconsin, where the State requirements are at least as stringent as the Federal requirements.

In the past several months, EPA has become concerned that actions by local and State governments to prohibit disposal of PCBs and other substances in their jurisdictions could frustrate the national goal of properly disposing of hazardous chemical substances. While EPA has always believed that States should have the right to set pollutions control standards more restrictive than the Federal standards, it would be a matter of national concern if this principle were to become the basis for refusal by States to share in the national responsibility for finding safe means for the proper disposal of hazardous substances. EPA has decided not to make any changes in its PCB preemption policy at this time. However, EPA will be considering the preemption issue further in its administration of the Resource Conservation and Recovery Act.

This statement was not issued until after EPA had approved the Warren County disposal site.

In *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978), the Court stated that:

Even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found "where compliance with both federal and state regulations is a physical impossibility ...," ... or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

This principle was applied in *Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission*, 472 F.Supp. 191 (S.D.Cal.1979). In *Pacific Legal Foundation* the court held that a California statute providing that no nuclear power plant shall be certified until a state commission finds that the authorized United States agency has approved technology for disposal of high-level nuclear waste was unconstitutional as impliedly preempted by the Atomic Energy Act.

■ Article VI of the Constitution of the United States provides, in part, "... This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme

Law of the Land; . . .". If this article of the Constitution means anything it must mean that a county may not pass an ordinance, the effect of which is to totally frustrate an entire statutory plan enacted by the Congress for the protection of citizens in all fifty states. Were the Court to approve this ordinance, no doubt the other ninety-nine counties in North Carolina would quickly enact identical bans. What, then, would North Carolina do with the PCB laced soil? Surely our neighbors in Virginia and Tennessee, South Carolina and Georgia would also object to our carrying such wastes into their states. The Warren County ordinance clearly stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress under the Toxic Substances Control Act and, therefore, is void.

### (5)

Plaintiff's sixth cause of action attacks the environmental impact statement filed by the state defendants as being defective in several particulars.

The General Assembly of North Carolina adopted an environmental policy act[18] in 1971, enunciating the state's environmental policy. *See* section II, *supra*. That statute contains the following specific provisions:

Any State agency shall include in every recommendation or report on proposals for legislation and actions involving expenditure of public moneys for projects and programs significantly affecting the quality of the environment of this State, a detailed statement by the responsible official setting forth the following:

a. The environmental impact of the proposed action;

b. Any significant adverse environmental effects which cannot be avoided should the proposal be implemented;

c. Mitigation measures proposed to minimize the impact;

d. Alternatives to the proposed action;

e. The relationship between the short-term uses of the environment involved in the proposed action and the maintenance and enhancement of long-term productivity; and

f. Any irreversible and irretrievable environmental changes which would be involved in the proposed action should it be implemented.

N.C.Gen.Stat. § 113A–4. To carry out and enforce the statutory mandate, appropriate regulations were adopted. 1 N.C.Ad.Code ch. 25.

Plaintiff contends that the final EIS is defective in that in its preparation defendants failed:

a. To review the environmental effects of their proposed action in the light of plaintiff's comments on the draft Environmental Impact Statement, failed to address plaintiff's comments in the final Environmental Impact Statement, and failed to attach a copy of plaintiff's comments to the final Environmental Impact Statement;

b. To describe the project adequately, by not developing and disclosing the actual details of the design of the waste chemical landfill, and only providing "conceptual" aspects of the design;

c. To describe the project adequately, by not identifying the availability of clay enriched soils to be used in construction of the clay liner;

d. To discuss the proposed mitigation measure and design alternative of treating clay enriched soils with chemicals such as TSPP to break down natural structures of the soil and reduce permeability;

e. To discuss the proposed mitigation measure and design alternative of including a compacted layer of 2:1 type (Montmorillonite) clay along the interior of the clay liner;

f. To set forth adequate procedures for selection of soils for the clay liner,

---

**18.** N.C.Gen.Stat. § 113A.

compaction of soils in the liner, and quality control of the project;

g. To deal with the probable failure of the leachate collection system;

h. To provide for adequate depth of reconstructed soil on top of the landfill site;

i. To deal with the economic and social consequences of probable failure of the landfill liner and migration of PCBs into the ground water.

a. *Standard of Review*

■ Since the adoption of the Environmental Policy Act by the North Carolina General Assembly in 1971, neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has considered the question of the standard to be used by the courts in reviewing the adequacy of an EIS. However, in *Orange County*, 46 N.C.App. 350, 265 S.E.2d 890, the North Carolina Court of Appeals, relying on *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2781, 49 L.Ed.2d 732 (1976), indicated a standard of review similar to that used by the federal courts in construing the federal EPA. The court there said:

> It is the policy of this State and the Federal Government that environmental impacts be considered before major governmental action involving the expenditure of public funds are taken. Nonetheless, once these environmental factors are properly taken into consideration, pursuant to prescribed procedures, governmental agencies may effect the completion of a proposed project, notwithstanding the fact that adverse environmental consequences may occur.... A court may, however, review the manner in which an agency decision has been made to ensure that environmental consequences have been considered in the manner prescribed by law.

*Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975), sets forth the standard used by the federal courts, as follows:

19. It is anticipated that only five acres of the site will be needed for the disposal of the PCBs.

In determining whether an agency has complied with Section 102(2), we are governed by the *rule of reason, i.e.*, we must recognize "on the one hand that the Act mandates that no agency limit its environmental activity by the use of an artificial framework and on the other that the act does not intend to impose an impossible standard on the agency." (footnote omitted). The court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.

b. *Specific Contentions*

■ In accordance with the rule of reason, the Court will now consider each of the contentions advanced by plaintiff.

(i) Contentions a and b.

In contention a, plaintiff cites the

> [f]ailure of defendants to review the environmental effects of their proposed action in the light of plaintiff's comments on the draft Environmental Impact Statement, failure to address plaintiff's comments in the final Environmental Impact Statement, and failure to attach a copy of plaintiff's comments to the final Environmental Impact Statement.

Plaintiff concedes that defendants have now met this objection.

In contention b, plaintiff alleges

> [f]ailure of defendants to describe the project adequately, by not developing and disclosing the actual details of the design of the waste chemical landfill, and only providing "conceptual" aspects of the design.

The final EIS, in addition to drawings of the proposed landfill, contains the following:

*Disposal Method*

a. *Construction Procedure*

> The disposal site for the PCB contaminated soil is located on approximately 142 acres of land in Warren County.[19] ...

The remainder will serve as a buffer zone.

The State of North Carolina proposes to construct the PCB landfill in accordance with conceptual plans approved by EPA.... Final construction plans must be approved by EPA. A general description of how the landfill will be constructed follows:

1. The facility will be designed such that excavation for the disposal site will not be closer than seven feet of the groundwater table as determined by on site soil borings and investigation of existing water table levels in the vicinity of the site.

2. Construct lower leachate detection system as a means of monitoring the artificial liner and compacted clay liner. The leachate detection system will consist of a porous material graded to a sump to allow removal of any liquid material.

3. Excavate and stockpile suitable soils which when compacted will have a maximum permeability of $1 \times 10-7$ cm/sec. Selection of suitable soils is to be monitored by a qualified soils engineer.

4. Prepare surfaces and install 30 mil artificial liner and liner protection materials along bottom and sides of pit.

5. Construct compacted clay liner in the bottom of the pit and along the side slopes of the disposal pit.

6. Place a layer of high permeability material over the compacted clay and grade to a sump area for collection and removal of leachate.

7. The soil contaminated with PCB waste will be placed on top of the leachate collection system in lifts as described in the operations plan.

8. After placement of all the PCB contaminated soil, a layer of bridging material will be placed then a two foot compacted clay liner will be constructed.

9. An artificial liner and protection materials will then be installed over the clay cap layer.

10. A foot of topsoil will be placed and graded for surface drainage. The ground surface of the landfill will then be prepared and seeded according to Soil Conservation Service recommendations.

11. All surface drainage during construction and after completion will be diverted from the landfill surfaces.

This is followed by a detailed description of how the landfill will be utilized and monitored:

b. *Operational Plan*

(1) *Excavation*

All necessary precautions and protective measures will be implemented to maintain integrity of the artificial liner. The backfill and placing of PCB contaminated soil will be completed as follows: Two ten-foot lifts will be used. The trucks will back into the open end of the pit and place the waste as near to working face as possible without the truck wheels getting on the waste. Tracked or rubber tired equipment will be used to push and compact the waste into place. The waste will be compacted to the maximum extent practicable. Clean earth will be placed on the floor of the pit as needed to keep the trucks out of the waste. The leachate collection system will be constructed as placement of first lift progresses. A 1-foot layer of clean earth will be placed over the middle 20 to 30 feet of the first lift so the trucks can be on a clean surface and the second lift will be completed as the first. After the second lift has been completed, including placing the residue from the runoff collection system, the open end of the pit will be completely closed. A minimum of one foot of clean soil will be placed on top of the waste and graded to two percent slope from the center toward the trench perimeters. A ten mil plastic cover will be placed over this one foot of soil. A 2 foot layer of compacted clay soil will be placed over this cover, 12 inches of top soil will be placed over the clay soil, graded to approximately two percent and seeded for erosion control. Additional erosion

control measures will be installed as required by the Division of Land Resources Department of Natural Resources and Community Development. A gas vent will be installed to prevent gas build-up and rupture of the artificial liner.

(2) *Surface Runoff*

During the process of placing the PCB contaminated soil in the disposal pit, surface runoff from the pit area will be collected in a holding pond. In accordance with [applicable regulations] the holding pond will be capable of diverting surface runoff from the pit area for a 24-hour 25-year storm. The water and silt collected in the holding pond will be analyzed for PCB and if negative the water will be released to surface drainage. If the analysis for PCB is positive, the water will be processed through a carbon filter prior to release. The carbon filter, and the silt in the holding pond will be placed in the disposal pit prior to final closing. Since the PCB disposal site is located above the 100 year flood plain, no flood diversion structures are required after completion of the PCB landfill operation. Surface run-on at the site will be diverted by grading the vegetative cover for the PCB landfill to topographical lows along the perimeter of the landfill site.

(3) *Leachate Collection and Detection Systems*

Two leachate collection systems will be installed. One system above the clay liner and another below the artificial liner. The leachate collection system will consist of a highly permeable material with PVC pipe for access and removal of any collected leachate. The leachate will be tested for PCB contamination. If the leachate contains PCB particles and depending on the concentrations found, the leachate material will be disposed of in an EPA approved PCB incinerator.

(4) *Sampling and Monitoring*

Three monitoring wells will be placed on a line through the site. One of the wells will be located above the disposal pit and two below, with one of the wells located at the area with the lowest groundwater. The leachate collection systems will be monitored monthly by the N. C. Department of Human Resources. The receiving surface water in the vicinity of the pit will be monitored biannually by the N. C. Department of Human Resources. The disposal site will be monitored as long as required by EPA.

(5) *Supportive Facilities*

A six foot chain link fence with barbed wire topping will be installed approximately 200 feet from the perimeter of the disposal pit to prevent unauthorized persons and animals from entering. The site will be periodically inspected and maintained in a manner to insure security and to prevent hazardous conditions from developing.

The Court concludes that the final EIS has adequate details of the design of the landfill, especially when read in conjunction with the description of how it will be utilized in placing the contaminated soil therein, to meet the requisites of the statute and regulations.[20] *Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971); *East 63rd Street Association v. Coleman,* 414 F.Supp. 1318 (S.D.N.Y. 1976); *Brooks v. Volpe,* 380 F.Supp. 1287 (W.D.Wash.1974).

(ii) Contentions c and f.

Here plaintiff objects to the following:

c. Failure of defendants to describe the project adequately, by not identifying the availability of clay enriched soils to be used in construction of the clay liner.

f. Failure of defendants to set forth adequate procedures for selection of soils for the clay liner, compaction of soils in the liner, and quality control of the project.

---

**20.** The *final* plans are subject to EPA approval.

Tests conducted by the State, and verified by an independent firm, concluded that there was a sufficient quantity of soil located at the site to construct the clay liner in accordance with EPA regulations. Specific results of testing are set forth in the final EIS. EPA's review verified the conclusion of the State and its consultant. The Court does not feel that it is necessary for the State to go to the proposed site and dig up, separate and store a sufficient amount of approved clay soil to construct the liner. When test borings and other samplings indicate that such is the case, nothing more is required.

 Quality control of the project was addressed in the approval of the project by the EPA where the following technical conditions of approval were set forth:

A soils engineering firm shall be employed to provide quality control during the construction of the clay-silt liner.

Engineering expertise shall be provided by the State or a consulting firm on-site during all operations to provide and assure conformance with the final plans. Such assurance shall be furnished to the Regional Administrator at the completion of the project with a copy of "as built" plans.

The Court perceives no requirement for the State to set forth in the EIS in detail *how* the quality control will be carried out. Reporting requirements of EPA insure that it will be done.

(iii) Contentions d, e, and h.

 Next plaintiff objects to the following:

d. Failure of defendants to discuss the proposed mitigation measure and design alternative of treating clay enriched soils with chemicals such as TSPP to break down natural structures of the soil and reduce permeability.

e. Failure of defendants to discuss the proposed mitigation measure and de-

sign alternative of including a compacted layer of 2:1 type (Montmorillonite) clay along the interior of the clay liner.

h. Failure of defendants to provide for adequate depth of reconstructed soil on top of the landfill site.

At the outset the Court would observe that although plaintiff argues that the above-cited "failures" fall under the duty on the agency to set forth "[m]itigation measures proposed to minimize the impact" as required by subsection (c) of N.C.Gen.Stat. § 113A–4(2), it would appear that the attack would more properly be considered, as a design alternative under subsection d. requiring "alternatives to the proposed action." Thus considered, the opinion of the Supreme Court in *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) is instructive:

Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

The treatment of the soil with chemicals or the use of montmorillonite clay was not proposed by plaintiff or anyone else when commenting on the draft EIS. Having been raised in plaintiff's supplemental complaint, defendants have submitted affidavits to the effect that either alternative would be cost prohibitive. More importantly, close scrutiny of the prepared environmental impact statements reflect that defendants *have* considered all suggested alternatives.[21]

21. For example, in the Addendum to Final Environmental Impact Statement, addressing the

comments of Warren County, the following appears regarding the clay content of the soil:

The final EIS specifically addresses the "cap design" of the landfill including the thickness thereof and incorporating suggestions by the United States Department of Agriculture, Soil Conservation Service, with respect thereto.

(iv) Contentions g and i.

 Finally, plaintiff objects to the following:

g. Failure of defendants to deal with the probable failure of the leachate collection system.

i. Failure of defendants to deal with the economic and social consequences of probable failure of the landfill liner and migration of PCBs into the ground water.

Both of these alleged shortcomings of the final EIS are based on the assumption by plaintiff that there will be failures in the system as designed, both in the leachate collection system and in the landfill liner, the result of which would be the dispersal of PCBs in ground water. Defendants contend that possibility of these failures are extremely remote, and they set forth persuasive arguments to back their position.[22] Of course, the defendants cannot guarantee the success of the planned system. The Court does agree, however, that the chance of failure is sufficiently minimal as to not require discussion in the EIS. The statute requires that the EIS set forth "[a]ny significant adverse environmental effects which cannot be avoided should the proposal be implemented." Under this requirement the EIS says:

The proposed removal and disposal of the PCB contaminated soil from the roadway shoulder will have some adverse ef-

Comment:
c. *Clay Content and Definitions*
"The critical features for retaining chemicals in place would be the *clay* content in the soils used in the soil liner. Clays are defined by both the International Society of Soil Science and U.S.D.A. classifications as solid particles of soil less than or equal to 0.002 mm in size (*Soil Survey Manual,* U.S.D.A. Handbook, No. 18, August 1951, p. 208). The impact statement does not identify the quantities of solids below 0.005 mm in size, which are fine silts. . ."

Response:
The *soil characteristics were evaluated un*der ASTM standards for engineering purposes not USDA standards. The clay content of the evaluated materials were sufficient to meet 40 CFR .71(b) standards for permeability, liquid limit, and plasticity index. There is no standard for percentage of clay, type of clay and mineralogical content in the 40 CFR .71(b) regulations.

22. 1. The PCB's in this case are adsorbed (sic) onto soil particles and have been treated with activated carbon to further assure that they are tightly bound to the soil.

2. Even without being bonded to the soil the PCB's are almost insoluable in water, and are virtually non-volatible [sic] in normal temperature ranges. Movement by diffusion is so speculative and remote in terms of any real effect within the foreseeable future as to be unworthy of discussion.

3. The PCB's will not migrate from the landfill without some physical medium to transport them. The *only foreseeable physical move*ment within the landfill could be the movement of water. The following features of

location and design will assure that there will be no movement of water through the landfill:

a. The landfill is located on a ridge so that the surface water to which the landfill might be subject is limited essentially to that which falls on the ridge.

b. The soil type and contours of the surrounding land surface and the grading to be done at the site assure that almost all rainfall will run off the site and adjacent areas rather than percolating through the soil.

c. The small amount of water which might percolate through the soil in areas adjacent to the landfill would provide a very small quantity of groundwater which would be available to infiltrate the landfill.

d. Even if groundwater were to come into contact with the landfill it would have to make its way through both the clay liner and the plastic liner and then find its way back out through the clay liner and plastic liner.

e. It would require massive amounts of water to move into and out of the landfill to create enough PCB in solution to be detectible. Even under ideal situations PCB's are virtually insoluable in water. The solubility is even further restricted by the fact that the PCB's in the landfill will be adsorbed (sic) onto soil and carbon.

f. The landfill is being constructed with the contaminated soil fourteen feet above the high groundwater elevation. In addition the State is committed to the construction of subsurface drainage to prevent the water table from reaching the outside or bottom of the landfill if mointoring (sic) detects the water table near the landfill liner.

fects on the environment. The most significant effect will be the taking of approximately five acres of land out of agricultural production for an indefinite period of time. The remaining 137 acres will be utilized as a buffer zone for the disposal pit. A portion or all of the land used as a buffer area may be leased by the State for agricultural or other compatible land uses. The disposal of the PCB contaminated soil at the Warren County site will restrict land use within the fenced area of the proposed disposal site.[23]

The Court concludes that defendants have fully met the statutory and regulatory requirements in preparing and filing the Final Environmental Impact Statement. It would appear to the Court that every conceivable phase of the operation has been adequately considered. All of plaintiff's challenges to the sufficiency of the EIS as set forth in its sixth cause of action are rejected.

The result is:

A. Joseph S. Lennon, Health Director of Warren County, is hereby added as a party plaintiff.

B. As to defendants, Harlan Boyles and Carter C. Pope and wife, Linda W. Pope, this action is dismissed as moot.

C. The motion of the remaining defendants for summary judgment is allowed.

The Clerk is directed to enter judgment for defendants and tax the costs of this action to the plaintiff.

SO ORDERED.

---

23. State's Brief in Support of Summary Judgment on Sixth Cause of Action at 16–17 (citations omitted). The EIS also considered the effect on workers, motorists and area residents in the removal of the soil from the various spill sites, concluding that none would be adversely effected.