**Henry F. TWITTY, et al., Plaintiffs,**

v.

**STATE OF NORTH CAROLINA, et al., Defendants.**

**No. 80–41–CIV–5.**

United States District Court,
E. D. North Carolina,
Raleigh Division.

Nov. 25, 1981.

Lewis A. Thompson, III, Banzet, Banzet & Thompson, Warrenton, N. C., for plaintiffs.

W. A. Raney, Jr., Sp. Deputy Atty. Gen., James L. Blackburn, U. S. Atty., N. C. Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM OPINION

BRITT, District Judge.

During the summer of 1978 many miles of roadside in North Carolina were saturated by a liquid waste containing a toxic chemical known as Polychlorinated Biphenyls (hereinafter PCBs). The State of North Carolina made plans to remove some or all of the soil containing the PCBs and dispose of it in a landfill and subsequently acquired a 142.3–acre site for that purpose in Warren County. In accordance with federal regulations the State applied to the Regional Administrator of the Environmental Protection Agency for approval of the site and approval was granted. Plaintiffs, Henry Twitty, William Twitty and Jean Davis Adams, who are individual adjoining landowners, instituted this action on 12 September 1979 in Warren County Superior Court against the State and Burley B. Mitchell, Jr., the Secretary of the North Carolina Department of Crime Control and Public Safety, seeking injunctive relief to prevent the use of the site for PCB disposal. Plaintiffs set forth four alleged causes of action and seek, as alternative relief, monetary damages. An amendment to complaint was filed 15 November 1979 in which John C. White, Regional Administrator of

Region IV of the United States Environmental Protection Agency, was added as a party defendant and a fifth cause of action was set forth. The matter was removed to this court pursuant to 28 U.S.C. §§ 1441(a) and 1442(a) upon petition of the United States Attorney.

The essence of plaintiffs' five alleged causes of action are:

1. That the storage of the PCBs will constitute a public and private nuisance "because of its danger to health and life."

2. That the "site approval" obtained by the State of North Carolina from the Environmental Protection Agency contains three impermissible waivers of regulatory requirements.

3. That the storage of the PCBs will be in violation of a county ordinance.

4. That the storage of the PCBs constitutes a "taking" of plaintiffs' properties entitling them to compensation.

5. That the Environmental Protection Agency has failed to prepare an environmental impact statement as required by 42 U.S.C. § 4332(2)(C).

The matter is now before the Court on motions for summary judgment filed by all defendants.

## I

Plaintiffs allege in their first cause of action that "the storage of PCBs upon the said Pope land, now owned by the State of North Carolina, in the immediate future, will constitute a public and private nuisance because of its danger to health and life."

Defendants contend that plaintiffs do not have standing to bring an action to abate a public nuisance, citing McLean v. Townsend, 227 N.C. 642, 44 S.E.2d 36 (1947), and Dare County v. Mater, 235 N.C. 179, 69 S.E.2d 244 (1952).

Plaintiffs allege in the third cause of action that the proposed use of the land by the State will violate a county ordinance enacted on 21 August 1979. The ordinance purports to prohibit the storage, dumping, or other disposal of PCBs in Warren County.

Congress adopted the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*) in 1976 because "among the many chemical substances ... being developed and produced, there are some whose ... disposal may present an unreasonable risk of injury to health or the environment ...." 15 U.S.C. § 2601(a)(2).

The Act provides:

If the Administrator [of the Environmental Protection Agency] finds that there is a reasonable basis to conclude that the ... disposal of a chemical substance ... presents or will present an unreasonable risk of injury to health or the environment, the Administrator shall ... [prohibit] or otherwise [regulate] any manner or method of disposal of such substance ... or of any article containing such substance....

15 U.S.C. § 2605(a)(6)(A).

With particular regard to PCBs, the Act directs the Administrator within six months after 1 January 1977 to promulgate rules to prescribe methods for their disposal. 15 U.S.C. § 2605(e). Pursuant to this statutory authority the Administrator of the Environmental Protection Agency adopted the regulations found at 40 C.F.R. § 761 (1979).

There is no contention by the plaintiffs that the Toxic Substances Control Act is unconstitutional or that the regulations promulgated thereunder contravene or exceed the authority delegated. This being true, the plaintiffs' first [nuisance] and third [violation of a county ordinance] causes of action must fail because courts will not enjoin as a nuisance an action authorized by valid legislative authority and because the Act preempts any local ordinances. *Ferris v. Wilbur*, 27 F.2d 262 (4th Cir. 1928). *See also McLean*, 227 N.C. at 642, 44 S.E.2d at 36; *Dare County*, 235 N.C. at 180, 69 S.E.2d at 245; *Orange County v. Heath*, 282 N.C. 292, 192 S.E.2d 308 (1972); *Amick v. Lancaster*, 228 N.C. 157, 44 S.E.2d 733 (1947).

II

Plaintiffs contend that the site approval by the United States Environmental Protection Agency is invalid, entitling them to injunctive relief because the approval contained three waivers of requirements of adopted regulations. In its application for approval of the disposal site, the State of North Carolina requested a waiver of the following four requirements of the regulations:

1. That a synthetic membrane liner be used. 40 C.F.R. § 761.41(b)(2) (1979).

2. That the bottom of the landfill be at least fifty feet from the "historical high water table." 40 C.F.R. § 761.41(b)(3) (1979).

3. That the groundwater be monitored for chlorinated hydrocarbons. 40 C.F.R. § 761.41(b)(6)(iii)(D) (1979).

4. That a leachate collection system be installed. 40 C.F.R. § 761.41(b)(7) (1979).

The Chief of the Residual Management Branch of the Environmental Protection Agency recommended to the Regional Administrator in a technical review of the application that the first three of the requested waivers be approved and that the fourth be denied. The requested waivers are addressed in the review as follows:

1. Requested waiver of the 30 mil. artificial liner:

The primary justification for the waiver was that the State would instead place a 10 mil. plastic liner "umbrella" top on the landfill covered by two feet of soil which would be seeded with grass and sloped. This design would minimize any rainwater infiltration into the landfill.

2. The requested waiver of the minimum water table level:

The site is located on the crest of a ridge ... and is above the 100 year floor level.... The bottom of the waste will not be 50 feet above the groundwater. The minimum distance will be held to 10 feet above the seasonal high groundwater table.... I have concluded that the clay liner in the bottom of the trench plus the liner on top of the waste which will act as an umbrella for infiltration prevention,

782

plus the leachate collection system and sump above and below the clay liner will sufficiently protect public health and the environment from "unreasonable risk of injury". . . .

3. The requested waiver of analysis for chlorinated hydrocarbons:

The regulations were written for commercial facilities which would be disposing of many different wastes. Since PCB is the only waste which will be disposed in this site, there is no point to monitoring for other chlorinated organics.

4. The requested waiver on the leachate collection system:

The proposed design does not show a leachate collection system under the liner as required by the regulation. Because of the groundwater proximity and the demonstrated public concern, I recommend that a leachate collection system and sump be installed under the soil liner to monitor the integrity of the soil liner. In addition, the leachate collection system above the soil liner should be required with the appropriate sump to provide the mechanism to allow pumping out of any leachate collected to prevent any significant hydraulic head buildup on the clay liner.

Acting upon the recommendations as set out above, the Regional Administrator approved the first three waivers and denied the fourth.

The regulations provide:

An owner or operator of a chemical waste landfill may submit evidence to the Regional Administrator that operation of the landfill will not present an unreasonable risk of injury to health or the environment from PCBs when one or more of the requirements of paragraph (b) of this section are not met. On the basis of such evidence and any other available information, the Regional Administrator may in his discretion find that one or more of the requirements . . . is not necessary to protect against such a risk and may waive

the requirements in any approval for that landfill.

40 C.F.R. § 761.41(c)(4) (1979).

■ There being no contention here that the Regional Administrator exceeded the scope of his authority, the standard for judicial review of an administrative decision under the National Environmental Policy Act is to determine whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 399 (4th Cir. 1977).

As stated in *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824, "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

■ This Court has made a "searching and careful" inquiry and finds nothing to suggest that the decision of the Regional Administrator was arbitrary, capricious, or an abuse of discretion. Rather, the Court concludes that it was based on relevant data and in accordance with law.

### III

■ Plaintiffs seek relief in their fourth cause of action under the doctrine of eminent domain by alleging that "[t]he threatened acts, if consummated, will deprive the plaintiffs of their properties without just compensation and without due process of law . . . ." [1]

In *Midgett v. North Carolina State Highway Commission,* 260 N.C. 241, 248–49, 132 S.E.2d 599, 606–07 (1963), an eminent domain case where plaintiff alleged a taking in the construction of a highway that caused water to flood his property, Justice Clifton L. Moore stated:

A nuisance maintained by a governmental agency impairing private property is a taking in the constitutional

1. Paragraph 20 of the complaint.

sense.... There need not be a seizure of the property or dispossession of the owners; it is a taking if the value is substantially impaired.... In order to create an enforceable liability against the government it is, at least, necessary that the [damage] be such as was reasonably to have been anticipated by the government, to be the *direct* result of the structure established and maintained by the government, and constitute an actual permanent invasion of the land, or a right appurtenant thereto, amounting to an appropriation of and not merely an injury to the property.... To constitute a permanent invasion of property rights and an impairment of the value thereof the obstruction or structure need not be permanent in fact, but it must be permanent in nature. A permanent structure is one which may not be readily altered at reasonable expense so as to remedy its harmful effect, or one of a durable character evidently intended to last indefinitely and costing practically as much to alter or remove as to build in the first place.... The removal of the permanent structure during the pendency of the action and after direct damage has resulted from its construction and maintenance would not abate the action or prevent the recovery of permanent damages.... Once the cause of action has occurred by the infliction of damage to the property, the taking is a *fait accompli.* This is true because the government had the authority to invade the property rights of the landowner and to appropriate them to public use in the first instance, and the owner had no right to abate the nuisance. His only remedy is a single action for permanent damage to his property by reason of the taking. The government has an easement to continue the obstruction permanently, and whether it will continue to maintain the obstruction, alter it, or remove it altogether is optional with the government.... HOWEVER, THERE CAN BE NO RECOVERY OF DAMAGES BEFORE THEY OCCUR, AND IF THE OBSTRUCTION IS REMOVED BEFORE THE INCIDENCE OF DAMAGE NO ACTION WILL LIE.... (Citations omitted. Emphasis added.)

These principles govern plaintiffs' rights insofar as the law of eminent domain are concerned.

IV

Plaintiffs allege in the fifth cause of action, as set forth in their amended complaint, that the defendant Administrator "failed and refused to prepare and publish an environmental impact statement as required by" the National Environmental Policy Act. The defendant Administrator contends that such a statement is not required since the Environmental Protection Agency is engaged in environmentally protective regulatory activity. As was said by Judge Gesell in *Maryland v. Train*, 415 F.Supp. 116, 121–22 (D.Md.1976),

The issue need not be labored. A host of cases support EPA's position based on functional equivalence.... Where federal regulatory action is circumscribed by extensive procedures, including public participation, for evaluating environmental issues and is taken by an agency with recognized environmental expertise, formal adherence to the NEPA requirements is not required unless Congress has specifically so directed. (Citations omitted.)

It is not contended that the Toxic Substances Control Act requires an environmental impact statement be prepared or circulated.

This effort by plaintiffs must fail for the reasons set forth above. The Court appreciates and understands the concern of plaintiffs and other citizens of Warren County concerning the disposition of the hazardous chemical wastes. All North Carolinians and, indeed, all Americans are likewise concerned. That very concern brought about the enactments of Congress which govern the disposition of this case. So long as those enactments—and the regulations promulgated thereunder—are followed, those concerns have been addressed in the most appropriate manner under our system of government.

The motions of the defendants for summary judgment are granted. The Clerk is directed to enter judgment for defendants and tax the costs of this action to the plaintiffs.

SO ORDERED.